**Marvin MITCHELL, Plaintiff**

v.

**CITY OF BOSTON, Trent Holland, and Robin Demarco, Defendants**

**No. 98–CV–11674–PBS.**

United States District Court,
D. Massachusetts.

Jan. 26, 2001.

Noah N. Rosmarin, Adkins & Kelston, Boston, MA, for plaintiff.

Merita A. Hopkins, Kevin S. McDermott, City of Boston Law Dept., Boston, MA, for defendants.

## MEMORANDUM AND ORDER

SARIS, District Judge.

On January 23, 1990, Marvin Mitchell, the plaintiff in this civil rights action, was convicted after a jury trial of forcible sexual intercourse with an eleven-year-old girl, and sentenced to nine to twenty-five years in state prison. Ultimately, he was exonerated by DNA evidence and released in April 1997.

Mitchell has now brought suit against the City of Boston and two Boston police officers, Trent Holland and Robin DeMarco. The complaint contains causes of action under federal civil rights law, state civil rights law, and state common law.[1] The common thread that runs throughout these claims is the allegation that the individual defendants engaged in a conspiracy to convict Mr. Mitchell with fabricated evidence and perjured testimony while the

---

1. The amended complaint includes the following counts: an unconstitutional practice and policy of the Boston Police Department in violation of 42 U.S.C. § 1983 (Count I); conspiracy to deny constitutional rights by perjured testimony and other unlawful acts in violation of 42 U.S.C. § 1983 (Count II); a violation of the Massachusetts Civil Rights Act, M.G.L. c. 12, §§ 11H–I against Holland and DeMarco (Count IV); false imprisonment against defendants Holland and DeMarco (Count V); malicious prosecution against Holland and DeMarco (Count VI); Intentional infliction of emotional distress against defendants Holland and DeMarco (Count VII). The plaintiff has amended his complaint to strike Count III which dealt solely with the arrest and suggestive identification, and has folded those allegations into the civil rights conspiracy alleged in Count II.

City of Boston countenanced a pattern or practice of such illegal police conduct.

The individual defendants have moved for summary judgment on all of the claims against them. For the reasons stated below, the motion for summary judgment on Counts IV, V, VI and VII is *ALLOWED*. The individual defendants' motion for summary judgment on Count II of the complaint is *DENIED* with respect to Trent Holland and *ALLOWED* with respect to Robin DeMarco.

## I. BACKGROUND

The following facts, unless otherwise noted, are undisputed:

On the morning of September 22, 1988, eleven-year-old Rhea DaSilva ("Rhea") reported to her mother ("Mrs. DaSilva") that she had been assaulted and raped on her way to school. She described her assailant as a slim, tall, light-skinned black man in his early twenties or late teens with short hair, and a long, narrow, clean-shaven face. She also described the assailant as being cross-eyed and wearing pinkish pants and a red and white shirt with some sort of emblem on it.

Mrs. DaSilva took Rhea to the Area B Boston Police Station to make a report. At the station Rhea spoke with an officer who completed an incident report. From there, Mrs. DaSilva took Rhea to the emergency pediatric care unit at Boston City Hospital, where both Rhea and her mother spoke with a detective from the Sexual Assault Unit of the Boston Police.

On the morning following the attack on her daughter, Mrs. DaSilva drove around her Roxbury neighborhood looking for someone who might fit the description of her daughter's assailant. At some point that morning, Mrs. DaSilva spotted Marvin Mitchell ("Mitchell") on Humboldt Avenue in Roxbury. At the time Mitchell was a slim, somewhat tall, and reasonably light-skinned black man in his early twenties. On that morning in particular he was also wearing a sweatshirt with a large red and white emblem on it. Unlike the description of the assailant, however, Mitchell had a well developed mustache and goatee and was not cross-eyed. Nor was he wearing pinkish pants. Mrs. DaSilva phoned the Area B Police Station and reported that she had located her daughter's assailant.

Trent Holland ("Holland") and Robin DeMarco ("DeMarco"), who were young officers and partners working on drug and other crimes, learned of the reported rape and were given a description of the assailant during roll call at the Area B Police Station. While he was standing on a Roxbury street corner, Mitchell was confronted by Holland and DeMarco and arrested for public drinking. Though the parties' dispute the circumstances and legitimacy of the arrest [2], Mitchell was never prosecuted for the drinking offense.

Mitchell was taken to the Area B Police Station where he was booked. The parties' versions of what transpired during and subsequent to the booking diverge. Mitchell contends that he was interrogated by Holland concerning, among other things, what clothes he had worn the previous day. In response to these questions, Mitchell states that he told Holland that he was wearing the same gray pants that he was wearing at the time of his arrest. Both Holland and DeMarco contend that Mitchell spontaneously declared that he was wearing pinkish-colored pants the previous day. Neither officer noted Mitchell's supposed incriminating statement in an incident report, as would be required by police procedures. In addition, neither officer reported the alleged statement to the Sexual Assault Unit, as required by police policy. Indeed, no mention of Mitchell's alleged statement was made by either officer for well over a year.

---

**2.** Specifically, Mitchell claims that the arrest was purely pretextual and without probable cause. Mitchell admits that he had a bottle of Wild Irish Rose in his possession which was half empty. Defendants contend that Mitchell appeared to be drunk at the time.

Holland and DeMarco notified the Sexual Assault Unit concerning their suspicions that Mitchell was the assailant in the Da-Silva case. The police arranged to have Rhea and her mother brought back to the police station to begin checking a photo book with hundreds of pictures for a possible identification. Mitchell was photographed and fingerprinted—procedures which would not have ordinarily been undertaken with a public drinking arrestee. Then the photo of Mitchell was shown to Rhea as part of an eight-picture photo array. Rhea identified Mitchell as looking like the man who raped her.[3] After Rhea confirmed the identification of Mitchell in another photo array, Mitchell was arrested for the rape.

Since neither Holland nor DeMarco informed the Sexual Assault Unit of Mitchell's alleged statement about wearing pink pants the previous day, Mitchell's house was never searched following his arrest to either confirm or deny that he possessed a pair of pink pants or other evidence of the crime, as would ordinarily have been required by procedure.

On November 4, 1988, a grand jury returned a four count indictment against Mitchell, alleging two counts of forced sexual intercourse with a minor and two counts of unnatural sexual intercourse with a minor. During the grand jury proceeding, a detective from the sexual assault unit summarized the evidence against Mitchell, which did not include his purported pink pants admission. After the indictment, but prior to trial, both Holland and DeMarco received the prestigious Commissioner's Commendations for apprehending Mitchell, the alleged rapist.

Approximately one month before the trial, in December 1989, Holland contacted Assistant District Attorney Leslie O'Brien ("O'Brien"), who was prosecuting the Mitchell case. During his communications with O'Brien, Holland revealed for the first time Mitchell's purported statement that he had worn pink pants on the day of the crime. Holland further reported that Mitchell made other incriminating statements that he would remember when he saw Mitchell in person. Holland was then identified as a witness in the Commonwealth's case against Mitchell. Mitchell contends that Holland knew at the time he contacted O'Brien that the prosecution's case had been considerably weakened by the fact that Mitchell had submitted to a blood test that showed there was no match between his blood and a spot of blood-semen mixture found on the victim's sweatshirt.

Mitchell's trial began on January 18, 1990, before Superior Court Judge J. Owen Todd. In addition to offering the testimony of Rhea and Mrs. DaSilva, the prosecution called David Brody of the Boston Police Crime Lab. Mr. Brody testified that, while the blood mixed with semen found on Rhea's sweatshirt did not match Mitchell's blood type, Mitchell could not definitively be ruled out as a suspect.[4] Holland was intended to be called as the final witness. Holland took the stand, but before he testified concerning the circumstances under which Mitchell made his allegedly incriminating statement, Judge Todd ordered a voir dire examination of the witness. During the voir dire examination, Holland testified that while he was asking Mitchell routine booking questions, Mitchell confessed to wearing pink pants the previous day. After hearing an objection from Mitchell's attorney, Judge Todd indicated that he was not satisfied that the

---

**3.** Mitchell contends that the photo array procedure was improper and highly suggestive. He notes that the presence of Mrs. DaSilva, who had already identified Mitchell based solely on her daughter's description, and the dissimilarity of the other photos likely influenced the young witness's selection of Mitchell.

**4.** The Commonwealth also admitted a picture of Mitchell's penis into evidence. According to Rhea's identification, her attacker had a mole on the head of his penis. The parties dispute, however, whether the photo actually showed such a mole or freckle.

Commonwealth had demonstrated that Mitchell's statement was made following a valid waiver of his *Miranda* rights. Upon the Commonwealth's request, Judge Todd adjourned and agreed to delay his evidentiary ruling until the following day. After court had adjourned, Holland indicated to O'Brien that DeMarco, who was still Holland's partner, would also have information relevant to Mitchell's alleged statement.

The following day of trial, January 19, 1990, two local newspapers published articles reporting that Holland, who was currently investigating the high profile Charles Stuart murder case, was cited in a recent Massachusetts Appeals Court decision for having possibly committed perjury.[5] When the trial resumed that day the parties agreed that Holland's testimony should be stricken.

The same morning, DeMarco, who had not been subpoenaed to testify and had not been identified by the prosecution as a witness, met with O'Brien. DeMarco was then called in lieu of Holland as the Commonwealth's final witness. DeMarco testified that, during Mitchell's booking, she and other officers were having a conversation about how people often wear the same clothes every day. According to DeMarco's testimony, Mitchell interjected by stating "I didn't have these clothes on yesterday, . . . I had pink pants on." Based on DeMarco's version of events, Judge Todd held that Mitchell's statements were not procured in violation of *Miranda* and were therefore admissible.[6]

Mitchell's trial concluded on January 19, 1990. The jury deliberated for two days and returned convictions on two of the four counts. Judge Todd sentenced Mitchell to nine to twenty-five years in the state prison. During his incarceration, Mitchell's mother and brother passed away. Mitchell maintained his innocence throughout and vowed to clear his name to honor the memories of his mother and brother.

Many years into his prison sentence, Mitchell contacted new attorneys to assist him. His attorneys petitioned the court for access to the rape kit and for permission to conduct DNA testing on the blood and semen samples obtained from Rhea's sweatshirt. In February 1997, CellMark Laboratories conducted tests comparing DNA from the victim's clothes with Mitchell's DNA. According to the tests, Mitchell was conclusively excluded as the source of DNA found on the sweatshirt. On April 23, 1997, Superior Court Judge Guy Voltera allowed Mitchell's motion for a new trial based on this evidence. The District Attorney's Office decided not to prosecute Mitchell a second time, and a Nolle Prosequi . was entered. Mitchell was the first person in Massachusetts to have a conviction overturned based on DNA evidence.[7]

Following his release, Mitchell brought the present action in state court in July 1999. Mitchell contends that DeMarco's trial testimony was false and that it was the product of a conspiracy between Holland and DeMarco to deprive Mitchell of his right to a fair trial. According to Mitchell the conspiracy was largely the brainchild of Holland, who first contacted O'Brien with the revelation that Mitchell had confessed to wearing pink pants on the day of the crime. In furtherance of

5. The appeals court decision referenced by the newspaper articles is *Commonwealth v. Cornish*, 28 Mass.App.Ct. 173, 547 N.E.2d 948 (1989).

6. The admission of DeMarco's testimony was the subject of an appeal in which the appeals court affirmed Mitchell's conviction. *See Commonwealth v. Mitchell*, 35 Mass.App.Ct. 909, 619 N.E.2d 619, *review denied*, 416 Mass. 1108, 625 N.E.2d 1368 (1993).

7. The defendants dispute the extent to which Mitchell was actually exonerated. They note that, since the prosecution dropped the charges following the new trial order, there has never been a judicially validated determination of Mitchell's innocence. Defendants have proffered no explanation, however, as to how one might reconcile Mitchell's guilt with the incontrovertible DNA test results, although they do point to the victim's recent testimony recounting that Mitchell was the assailant.

the conspiracy, Holland allegedly convinced DeMarco to offer perjurious testimony when his own testimony was endangered by the potential *Miranda* problems raised in voir dire and by the release of news stories concerning potentially false testimony he had given in a previous trial. Thus, according to Mitchell's version of events, Holland convinced DeMarco to lie about Mitchell's admission—thereby corroborating identification of Mitchell as the assailant—and about the manner in which the confession took place—thereby curing a potential *Miranda* issue.

The action was removed to federal court. After a lengthy period during which the parties attempted mediation and engaged in prolonged discovery, this Court ordered bifurcation of the trial, with the liability of the individual defendants to comprise the first phase and the city's liability to comprise the second. With the start date of the first trial looming on the horizon, the individual defendants brought the present motion for summary judgment based on their statute-of-limitations, immunity defenses, and handful of other bases.

## II. DISCUSSION

### A. Summary judgment standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter or law." *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir.1995) (quoting Fed R. Civ. P. 56(c)). To prevail on summary judgment, the moving party must show that there is an absence of evidence to support the nonmoving party's position. *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party satisfies this requirement, the burden shifts to the non-moving party to establish the existence of at least one factual issue

that is both genuine and material. *See LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 841 (1st Cir.1993); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To successfully oppose summary judgment, the non-moving party "may not rest upon mere allegation or denials of his pleading," but must set forth specific facts showing that there is a genuine issue for trial. *LeBlanc*, 6 F.3d at 841 (quoting *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505) (citations omitted). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

### B. 42 U.S.C. § 1983 (Count II)

#### 1. Statute of Limitations

■ The first issue raised is whether the statute of limitations on Mitchell's § 1983 claim was tolled until the favorable termination of the criminal proceedings in 1997. The defendants argue that the claim accrued either at the time of Mitchell's arrest or at the time of trial and, therefore, expired long before this action was brought in 1998. Plaintiff argues that these causes of action could not be asserted until he was vindicated and were therefore timely.

Count II of Mitchell's complaint alleges that Holland and DeMarco engaged in a conspiracy in violation of 42 U.S.C. § 1983 to deprive Mitchell of a fair trial that began with the false and pretextual of arrest for public drinking, included the suggestive photo identification, and concluded with the coordination of the fabricated confession concerning the pink pants. In *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the Supreme Court held that a § 1983 claim that calls into question the

lawfulness of a criminal conviction or confinement does not accrue until "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus...." *Id.* at 486–87, 114 S.Ct. 2364. In so doing, the Court reasoned that this rule would prevent collateral attacks on the validity of outstanding criminal judgments through the a civil damages action. *See id.* at 484–86, 114 S.Ct. 2364. The question to be resolved, therefore, is whether the claim is for a "harm caused by actions whose unlawfulness would render a conviction or sentence invalid ...." *Id.* at 486, 114 S.Ct. 2364.

The defendants argue that, because this count was not styled as a claim analogous to malicious prosecution (as was the case in *Heck*), there is no requirement that Mitchell's conviction be overturned before his claim accrues. Defendants' argument on this account is unpersuasive. Prior to Mitchell's exoneration in 1997, any § 1983 claim seeking damages for the deprivation of his right to a fair trial would have required a civil collateral attack on the validity of his conviction and would have

thereby been barred by *Heck.* Count II of Mitchell's complaint therefore falls within the three-year statute of limitations for a § 1983 claim.

### 2. Absolute immunity under *Briscoe*

■ The toughest question presented on this motion is whether the individual defendants, Holland and DeMarco, are absolutely immune from a damages action by virtue of their roles in Mitchell's criminal trial. The official seeking absolute immunity bears the burden of showing such immunity is warranted. *See Malley v. Briggs*, 475 U.S. 335, 340, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

■ In *Briscoe v. LaHue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), the Supreme Court held that a police officer is absolutely immune from a damages action under 42 U.S.C. § 1983 for giving testimony at a criminal trial. The individual defendants argue that *Briscoe*'s holding and logic immunize them against the conspiracy claims alleged here.[8] Mitchell argues that his allegations of wrongdoing on the part of Holland and DeMarco extend beyond the mere act of perjury, and, as a result, the individual defendants are not absolutely immune from liability.[9]

---

8. The defendants, putting all of their eggs in the absolute immunity basket, have made no argument on these motions that, absent success on this argument, they are entitled to qualified immunity. In addition, the defendants have not argued entitlement to absolute immunity with regard to any of the other counts of the complaint.

9. The plaintiff also argues that the individual defendants have waived the absolute immunity defense by failing to plead it in their answer and by waiting until a summary judgment motion shortly before trial to raise the issue. While it is true that a party may waive an immunity defense that is raised late in the game, that determination is largely within the discretion of the district court judge. *See Guzman–Rivera v. Rivera–Cruz*, 98 F.3d 664, 668 (1st Cir.1996). It would have been preferable for the issue to have been argued earlier, but I find no waiver. First, with regard to the defenses plead in the answer, the defen-

dants raised a qualified immunity defense which adequately placed the plaintiff on notice of a *Briscoe*-type defense. *See Jean v. Collins*, 155 F.3d 701, 705 n. 1 (4th Cir.1998) (en banc) ("The officers did plead qualified immunity, however, and we may properly consider the closely related question of the scope of the immunity to which they are entitled."), *vacated on other grounds*, 526 U.S. 1142, 119 S.Ct. 2016, 143 L.Ed.2d 1029 (1999), *aff'd following remand*, 221 F.3d 656 (4th Cir.2000), *cert. denied*, 69 U.S.L.W. 3456 (U.S. Jan. 8, 2001). Second, this is not a situation where, as in *Guzman–Rivera*, the defendants had filed previous summary judgment motions that failed to raise the issue. Rather, the defendants' arguments for absolute immunity here have been raised in their only motion for summary judgment and have been filed within a time frame set by the court. Moreover, defendants alerted the parties to the defense at the Scheduling Conference in October, 2000.

In *Briscoe*, the Court noted at the outset that "[t]he immunity of parties and witnesses from subsequent damages liability for their testimony in judicial proceedings was well established" at common law. *Id.* at 330–31, 103 S.Ct. 1108 (footnote omitted). The policy behind this grant of immunity was to encourage truthful testimony. If a witness could be later subjected to an action for damages, she "might be reluctant to come forward to testify" or her "testimony might be distorted by the fear of subsequent liability." *Id.* at 333, 103 S.Ct. 1108. The Court further noted that absolute immunity had been extended to those who perform official functions in the judicial process. *See id.* at 334, 103 S.Ct. 1108 (discussing absolute immunity for judges, prosecutors, and others acting under color of law during the judicial process). Based on these factors, the Court held that witnesses, like other persons who perform functions in the judicial process, were entitled to absolute immunity from damage actions under § 1983. The Court added that there was no basis to except police officers from the general rule of absolute immunity for witnesses, reasoning that even if the traditional reasons for immunity applied with different force to police officers, the protection of police officers' ability to effectively perform their official duties was an important factor weighing in favor of immunity. *See id.* at 342–43, 103 S.Ct. 1108. As the Court stated, "[p]olice officers testify in scores of cases every year, and defendants often will transform resentment at being convicted into allegations of perjury by the state's official witnesses." *Id.* at 343, 103 S.Ct. 1108. Defending against such claims, even when dismissed before trial, would consume "a considerable amount of time and resources." *Id.*

In the wake of the Supreme Court's holding in *Briscoe*, most circuits have rejected § 1983 claims alleging that the defendants who were testifying witnesses were not entitled to absolute immunity because they were engaged in a conspiracy with each other or with the prosecutor to offer perjurious testimony in a criminal case against the plaintiff. *See Franklin v. Terr*, 201 F.3d 1098, 1101–02 (9th Cir.2000) (involving allegation of conspiracy between two testifying witnesses); *Hunt v. Bennett*, 17 F.3d 1263, 1267–68 (10th Cir.1994) (holding prosecutor and police officer witness absolutely immune from claim of conspiracy to present false testimony); *Snelling v. Westhoff*, 972 F.2d 199, 200 (8th Cir.1992) (per curiam) (rejecting conspiracy claim and pointing out that plaintiff's conspiracy allegations were "conclusory"), *cert. denied*, 506 U.S. 1053, 113 S.Ct. 977, 122 L.Ed.2d 132 (1993); *McArdle v. Tronetti*, 961 F.2d 1083, 1085–86 (3rd Cir. 1992) (involving testifying witnesses); *House v. Belford*, 956 F.2d 711, 720–21 (7th Cir.1992) (rejecting claim of conspiracy between prosecutor and testifying witness on ground of absolute immunity); *Miller v. Glanz*, 948 F.2d 1562, 1570–71 (10th Cir.1991) (rejecting claim for conspiracy among testifying witnesses); *Alioto v. City of Shively*, 835 F.2d 1173, 1174 & n. 1 (6th Cir.1987) (same).

Courts have differed on whether a nontestifying police officer is shielded by absolute immunity when he is charged with persuading a testifying witness to commit perjury. *Compare Young v. Biggers*, 938 F.2d 565, 569 (5th Cir.1991) (rejecting a claim of absolute immunity for two police officers charged with persuading the chief prosecution witness to falsely identify him as the perpetrator of the crime where there were specific, non-conclusory allegations) *with Jones v. Cannon*, 174 F.3d 1271, 1288–89 (11th Cir.1999) (holding that absolute immunity shields non-testifying detective from an independent § 1983 claim for procuring false testimony at trial).

The Second Circuit is the only court of appeals to explicitly adopt the stance that testifying witnesses engaged in conspiracies to commit perjury are not immunized from a damages action under § 1983. *See San Filippo v. U.S. Trust Co.*, 737 F.2d

246 (2nd Cir.1984), *cert. denied,* 470 U.S. 1035, 105 S.Ct. 1408, 84 L.Ed.2d 797 (1985). In *San Filippo,* the plaintiff claimed that two grand jury witnesses "had deprived [him] of his civil and constitutional rights ... by conspiring with [the district attorney] to present false testimony to, and withhold exculpatory evidence from, [a] grand jury ...." *Id.* at 252. The court reasoned that "[*Briscoe*] was expressly limited to immunity for testimony given in judicial proceedings, and its rationale—to encourage witnesses to come forward with all they know—does not justify extending that immunity to cover extrajudicial conspiracies ... to give false testimony." *Id.* at 255. The Second Circuit expounded upon this holding in a later case affirming the same principle:

> The holding in *San Filippo* is based on the crucial distinction between the presentation of perjurious testimony and a conspiracy to present perjurious testimony. With regard to witnesses, the distinction is important because witnesses enjoy immunity only for their actions in testifying, and are not immune for extra-judicial actions such as an alleged conspiracy to present false testimony.

*Dory v. Ryan,* 25 F.3d 81, 83 (2nd Cir. 1994).

The Second Circuit has also recognized a § 1983 claim against a non-testifying police officer for fabricating false information:

> When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983.

*Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 130 (2nd Cir.1997) (refusing to dismiss a § 1983 claim that two officers violated the plaintiffs' clearly established constitutional rights by conspiring to fabricate and forward to prosecutors a known false con-

fession almost certain to influence a jury's verdict).

The First Circuit has not yet had the opportunity to speak with a firm voice in the post-*Briscoe* debate. In *Malachowski v. City of Keene,* 787 F.2d 704 (1st Cir.), *cert. denied,* 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986), the court suggested that absolute immunity "may not extend to allegations that [that the defendant proffered false testimony] as part of an overarching conspiracy...." *Id.* at 712. The court did not decide the question, however, because the plaintiff failed to plead any facts in support of their conclusory allegations of conspiracy. *See id.* Later, in *Watterson v. Page,* 987 F.2d 1 (1st Cir. 1993), the court similarly rejected the plaintiff's conspiracy claims on the grounds that the allegations supporting the claim were merely conclusory. *See id.* at 8 n. 7. However, *Watterson* stated in dictum that "[a]ppellants' third allegation that Seymour conspired with Page to present false testimony to and withhold material evidence from the court hearing the abuse charges, fails for a different reason: All witnesses at judicial proceedings have an absolute immunity from damages liability based on their testimony." *Id.* at 9. Plaintiffs rely on these cases to argue that the First Circuit may be inclined to follow an approach closer to that of the Second Circuit, but the tea leaves are not so easy to read.

One district court in Massachusetts has followed the lead of the Second Circuit by holding that "witnesses may be sued under § 1983 for the testimony they gave as part of a conspiracy consisting of their testimony and other non-testimonial acts." *Cignetti v. Healy,* 89 F.Supp.2d 106, 117 (D.Mass.2000) (Lasker, J.). The court in that case, however, rejected the plaintiff's claims as based on "conclusory allegations" and "improbable inferences." *Id.* at 118.

■ I agree with the many courts that have held that a plaintiff cannot use a conspiracy claim to short-circuit *Briscoe's*

grant of absolute immunity to testifying witnesses. *See, e.g., Franklin*, 201 F.3d at 1101 ("allowing a plaintiff to circumvent the *Briscoe* rule by alleging a conspiracy to present false testimony would undermine the purposes served by granting witnesses absolute immunity from damages"). However, as several courts including the First Circuit have noted, a defendant cannot use *Briscoe*'s rule of absolute immunity as a shield to protect a whole course of conduct merely because, at some point, the defendant was linked to testimony given in a judicial proceeding. *See Malachowski*, 787 F.2d at 712; *Guzman–Rivera v. Rivera–Cruz*, 55 F.3d 26, 29 (1st Cir.1995) (stating the immunized nature of an act "does not spread backwards like an inkblot, immunizing everything it touches."); *Juriss v. McGowan*, 957 F.2d 345, 348 (7th Cir.1992) (holding *Briscoe* does not absolutely immunize police officer for a claim arising out of a false arrest on warrant that was based on the officer's false grand jury testimony).

▪ It is a well settled principle of common law that "[g]rants of absolute immunity ought to be interpreted narrowly to serve only the purpose justifying the immunity." *Webster v. Sun Co., Inc.*, 731 F.2d 1, 4 (D.C.Cir.1984); *see also Burns v. Reed*, 500 U.S. 478, 487, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) ("We have been quite sparing in our recognition of absolute immunity and have refused · to extend it any further than its justification would warrant.") (internal citations and quotations omitted).

*Briscoe* and its progeny require a functional approach to evaluating claims of immunity. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 269, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (evaluating claim to qualified immunity according to a "functional approach" which looks to "the nature of the function performed, not the identity of the actor who performed it"). *Accord Burns*, 500 U.S. at 486, 111 S.Ct. 1934 (holding that absolute prosecutorial immunity does not extend to those aspects of the prosecu-

tor's responsibility that cast him in the role of administrator or investigative officer rather than that of advocate); *Forrester v. White*, 484 U.S. 219, 229, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988). As such, immunity should attach to the conduct that is intended to be protected by the grant of absolute immunity, namely, the participation in the judicial process. *See Briscoe*, 460 U.S. at 335, 103 S.Ct. 1108.

▪ In order to prevent a back-door route to holding participants in the judicial process liable under a conspiracy theory, absolute immunity should also extend to conduct that is inextricably tied to participation in the judicial process. *See Franklin*, 201 F.3d at 1102 (immunizing defendant from liability for conspiratorial behavior that is "inextricably tied to her testimony"); *Malley v. Briggs*, 475 U.S. 335, 342, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (absolute immunity extends to functions "intimately associated with the judicial phase of the criminal process."); *McArdle v. Tronetti*, 961 F.2d 1083, 1085 (3rd Cir.1992) ("The determinative issue . . . is whether [the defendants claiming immunity] were functioning as integral parts of the judicial system . . when they performed the acts on which [the] claims were based."). Nonetheless, the courts should be wary about extending absolute immunity to extra-judicial actions taken as part of a conspiracy to deprive a criminal defendant of his right to a fair trial even when that conspiracy culminates in protected testimony. *See Dory*, 25 F.3d at 83; *McArdle*, 961 F.2d at 1086 (3rd Cir. 1992) (holding that defendant is not immune for actions while "he was functioning neither as a witness, nor as an arm of the court.").

With this functional analysis in mind, I will address each of the individual defendant's immunity claims separately.

a. *DeMarco*

▪ Mitchell claims that DeMarco's role in the conspiracy extended beyond the act

of falsifying her court testimony because she met with Holland who instructed and coached her regarding the testimony she would give the following day. Mitchell contends these acts subject DeMarco to liability because they involve extra-judicial planning and premeditation that are not necessarily incident to the immunized act of presenting false testimony in a criminal proceeding.

These facts, even if proven at trial, are "inextricably tied" to DeMarco's function as a witness in Mitchell's trial. Disregarding absolute immunity for such actions runs the risk of deterring a witness from coming forward and giving full and truthful testimony. Plaintiffs have no evidence that DeMarco engaged in any non-testimonial acts in furtherance of the alleged conspiracy which independently give rise to a civil rights cause of action. Therefore, even if DeMarco, a testifying witness, conspired with Holland (which she denies), DeMarco is entitled to summary judgment on Count II of the complaint.[10]

### b. *Holland*

■ The claim against Holland is far more difficult. According to Mitchell, Holland was the mastermind of the plot to fabricate evidence of Mitchell having confessed to wearing pink pants on the day of the attack. In furtherance of this plot, Holland contacted O'Brien more than a year after Mitchell's arrest with the revelation of the confession. During Holland's contact with O'Brien, he also claimed that he would provide additional incriminating statements at a later time. Then, after his own effort to introduce the police station admission was torpedoed by the potential *Miranda* issue and the breaking stories in the news media, Holland's testimony was stricken. Holland is alleged to have taken

it upon himself to fill the gaps in his story by soliciting false testimony from DeMarco. According to Mitchell's version of events, Holland convinced his then-partner to fabricate the admission and, in addition, to cast the circumstances of the confession in a light that would ensure its admissibility at trial.

Holland's actions differed from DeMarco's in that they were not inextricably tied to his role in the judicial proceedings. To be sure, Holland's stricken testimony—to the extent that Holland actually testified—cannot provide the basis for Mitchell's claim. But all of the key allegations in the conspiracy claim deal with the extra-judicial course of conduct taken on Holland's part to secure the conviction of Mitchell with a fabricated story of a police station confession. *See Young*, 938 F.2d at 570 (holding plaintiff could withstand summary judgment with non-conclusory allegations that police officers conspired to deny plaintiff's right to fair trial by, *inter alia*, persuading witnesses to falsely testify). Under these circumstances, a defendant is not entitled to take cover behind the shield of absolute immunity. *See McArdle*, 961 F.2d at 1086 (rejecting absolute immunity defense for actions taken outside of role as a witness). *Accord Juriss*, 957 F.2d at 348. *But see Jones*, 174 F.3d at 1288–89 (holding that *Briscoe* immunity extends to conspiracy claim and claim of suborning perjury). Holland's motion for summary judgment on Count II therefore must be denied.[11]

### C. Massachusetts Civil Rights Act (Count IV)

■ Count IV is a claim under the Massachusetts Civil Rights Act ("MCRA"), M.G.L., ch. 12, § 11I. "To establish a claim under the Act, the plaintiffs must prove

---

10. Plaintiffs allege in the newly amended complaint that defendants conspired to arrest him on a false pretext and to create a suggestive identification procedure. However, these claims have not been supported in the record to date, and for reasons explained later, are time-barred.

11. Count II is currently pleaded as a conspiracy claim under § 1983. Arguably, the count could also be pleaded as an independent claim under § 1983 to suborn perjury and to fabricate evidence.

that (1) their exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'" *Swanset Dev. Corp. v. City of Taunton,* 423 Mass. 390, 395, 668 N.E.2d 333 (1996). Plaintiff's MCRA claim is essentially duplicative of his federal civil rights claim in Count II, but adds the element that Mitchell was deprived of his rights by means of "intimidation and coercion" on the part of Holland and DeMarco.

 Unlike his § 1983 claim, however, Mitchell's MCRA claim accrued at the point he knew or should have known of the alleged conspiracy to falsely convict him, rather than upon the termination of criminal proceedings in his favor. *See Messere v. Murphy,* 32 Mass.App. 917, 918, 585 N.E.2d 350 (1992) (rescript opinion). In *Messere,* a pre-*Heck* decision, the plaintiff brought a claim under the MCRA alleging that the defendants, who were law enforcement officers, deprived him of his right to a fair trial by withholding crucial evidence, giving false testimony, and intimidating potential witnesses. *See id.* at 917, 585 N.E.2d 350. The court held that at the very least "the plaintiff's criminal trial, conviction and incarceration certainly 'were event[s] likely to put [him] on notice' of the alleged wrongs." *Id.* at 918, 585 N.E.2d 350 (alterations in original) (quoting *Flynn v. Associated Press,* 401 Mass. 776, 780, 519 N.E.2d 1304 (1988)). Furthermore, the court held that the plaintiff was not entitled to have his claim tolled during his term of incarceration because the legislature had removed prisoners from the states general tolling statute in 1987. *See id.* (citing M.G.L. ch. 260, § 7 and Mass. Stat.1987, ch. 198).

 The plaintiff argues that the holding and reasoning of *Heck* should apply with equal force in the determination of when his civil rights claim under state law accrued. To be sure, Massachusetts courts often look to federal interpretations of § 1983 in cases where the contours of the MCRA have yet to be defined. *See Duarte v. Healy,* 405 Mass. 43, 47, 537 N.E.2d 1230 (1989). In addition, the *Heck* decision announces a sound policy against permitting civil damages actions that undermine the validity of criminal convictions. Nonetheless, where the Massachusetts Appeals Court has already supplied an unambiguous interpretation of state law, that ruling should not be second-guessed by this Court.

Thus, Mitchell's state civil rights claim is barred by the three year statute of limitations because plaintiff's criminal trial, conviction and incarceration put plaintiff on notice of the alleged wrongs for purposes of determining when the cause of action accrued. *See* M.G.L. ch. 260, § 2B. *But see Lombard v. Salisbury Police Dep't,* No. 942937B, 1995 WL 1146874, at * 3 (Mass.Super.Ct. June 14, 1995) (Welch, J.) (applying *Heck* to toll plaintiff's claim under MCRA until criminal proceedings were terminated in his favor).

### D. False Imprisonment (Count V)

 Count V is a common law claim for false imprisonment. Essentially, Mitchell claims that defendants trumped up a charge of public drinking as a pretext to hold him for the rape on September 23, 1988. Thus, plaintiff's allegations amount to a claim for false arrest, which is "a species of false imprisonment." *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2nd Cir.1995), *cert. denied,* 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996).

 The elements of a false are arrest claim are that: "(1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the defendant had no privilege to cause the confinement." *Calero–Colon v. Betancourt–Lebron,* 68 F.3d 1, 3 n.6 (1st Cir.1995) (citing Restatement (Second) of Torts, §§ 35 and 118, comment

b (1965)). Favorable termination of the proceedings is not an element of the false arrest claim. *See Singer,* 63 F.3d at 118. "If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more." *Heck v. Humphrey,* 512 U.S. at 484, 114 S.Ct. 2364 (quoting W. Keeton et al., *Prosser and Keeton on Law of Torts* 888 (5th ed.1984)). *See also Jordan v. C.I.T. Corp.,* 302 Mass. 281, 285, 19 N.E.2d 5 (1939) (limiting damages to the actual time confined under arrest ending with the time the court committed plaintiff to jail for failure to furnish surety).

Properly understood, the false arrest claim seeks a remedy for the restraint on the plaintiff's bodily movement for the limited period between the time of his arrest and, at the very latest, his indictment by the grand jury. Because the plaintiff knew at the time of his arrest all the facts necessary to challenge its lawfulness, the action is time-barred.

### E. Malicious prosecution (Count VI)

The individual defendants have moved for summary judgment on Count VI of the complaint on the grounds that Mitchell has failed to demonstrate a disputed issue of fact on two elements of his claim for malicious prosecution. The required elements for such a claim are that "criminal proceedings were initiated against [the plaintiff] without probable cause and for an improper purpose and were terminated in his favor." *Meehan v. Town of Plymouth,* 167 F.3d 85, 88–89 (1st Cir.1999) (quoting *Landrigan v. City of Warwick,* 628 F.2d 736, 745 n. 6 (1st Cir. 1980)). Alternatively, a person "who takes an active part in continuing or procuring the continuation of criminal proceedings initiated ... by another is subject to the same liability for malicious prosecution as if he had then initiated the proceedings." Restatement (Second) of Torts § 655 (1976). *Accord Bicknell v. Dorion,* 33 Mass. (16 Pick.) 478 (1835).

The defendants argue first that neither DeMarco nor Holland "initiated" or "took an active part in the continuation of" the criminal proceedings which led to Mitchell's conviction. Secondly, the defendants argue that, in any event, Mitchell's criminal prosecution did not lack probable cause.

With regard to the first argument, Mitchell responds by asserting that Holland and DeMarco caused criminal proceedings to be initiated against Mitchell by baselessly arresting him for public drinking, requiring that he be fingerprinted and photographed, and by reporting Mitchell to the Sexual Assault Unit as a suspect in the attack. These contentions, however, ignore the fact that Mitchell was arrested for the rape by an officer from the Sexual Assault Unit, indicted by a grand jury that did not hear testimony from either Holland or Mitchell, and prosecuted by a district attorney who did not hear from Holland until at least one year after the arrest. Neither officer was a complaining witness. Therefore, there is no evidence that either defendant took an active part in initiating the rape charges against defendant. *See Ziemba v. Fo'cs'le, Inc.,* 19 Mass.App.Ct. 484, 488, 475 N.E.2d 1223 (holding that plaintiff failed to show genuine issue of fact that arresting officers did not exercise independent judgment), *review denied,* 394 Mass. 1104, 478 N.E.2d 1274 (1985).

Even assuming Mitchell would have never been arrested or indicted but for Holland's and DeMarco's turning over Mitchell (along with the photographs and fingerprints) to the Sexual Assault Unit, that evidence would not be enough to salvage a claim. "The giving of the information or the making of the accusation ... does not constitute a procurement of the proceedings that [a] person initiates if it is left to the uncontrolled choice of the third person to bring the proceedings or not as he may see fit." Restatement (Second) of Torts § 655, comment d (1977). *Accord Conway v. Smerling,* 37 Mass.App.Ct. 1, 4, 635 N.E.2d 268 (1994).

With respect to Holland, the viability of the malicious prosecution claim is strengthened by the inference that he called O'Brien with the pink pants admission when it looked as if the case was in trouble because of the forensic testimony. However, there is no evidence Holland's proactive approach was tantamount to continuing the criminal proceedings initiated by another.

In any event, even if Holland's attempts to revivify a faltering prosecution constitute malicious prosecution, the existence of probable cause dooms this claim. In light of the victim's identification of Mitchell after viewing a photo array, I conclude that Mitchell cannot raise a triable question as to whether there was probable cause to initiate and continue the prosecution.

## F. Intentional Infliction of Emotional Distress

Count VII is a common law claim for intentional infliction of emotional harm. Under Massachusetts law, a plaintiff must prove that: (1) the defendant intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of their conduct; (2) the defendant's conduct was "extreme and outrageous," "beyond all bounds of decency," and was "utterly intolerable in a civilized community"; (3) the defendant's actions caused distress to the plaintiff; and that (4) the emotional distress sustained by the plaintiff was "severe" and of a nature "that no reasonable man could be expected to endure it." *Sholley v. Town of Holliston*, 49 F.Supp.2d 14, 22 (D.Mass. 1999) (quoting *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144–45, 355 N.E.2d 315 (1976)). This tort requires that defendant's actions be without privilege. *See Sullivan v. Birmingham*, 11 Mass.App.Ct. 359, 361, 416 N.E.2d 528 (1981). In addition, the doctrine of testimonial absolute immunity shields defendants from any claim of intentional infliction of emotional distress arising from testimony given in a judicial proceeding. *See id.*

There is no Massachusetts case law on whether a claim of intentional infliction of emotional distress arising from the allegation of the fabrication of evidence resulting in a criminal conviction accrues on the date of the fabrication or the date the criminal proceedings are terminated in favor of plaintiff. Nonetheless, borrowing from the policies underpinning *Messere*, I conclude that Mitchell's claim, to the extent it survives absolute immunity, was untimely because Mitchell knew or should have known of the defendants' wrongful conduct at the time of his trial, conviction, and incarceration.

## III. CONCLUSION AND ORDERS

For the reasons stated above, the individual defendants' motion for summary judgment (Docket No. 70) is **ALLOWED** with respect to Counts IV, V, VI and VII. The motion for summary judgment on Count II of the complaint is **DENIED** with respect to defendant Trent Holland and **ALLOWED** with respect to defendant Robin DeMarco.

Defendants have stated they are likely to file an interlocutory appeal if the court denies their motion for summary judgment on the ground of absolute immunity. Because the municipal liability claim is still pending, discovery shall commence on that claim forthwith. All municipal liability discovery shall be completed by April 30, 2001. Any motion for summary judgment shall be filed by May 4, 2001. Any opposition shall be filed by May 18, 2001.