2005 SD 98

Todd A. HEIB, Plaintiff and Appellant,

v.

Robert LEHRKAMP, Jr., individually and in his official capacities with Meade County, South Dakota, Defendant and Appellee.

Susan Grusing, Guardian Ad Litem of J.G., a female juvenile, and J.G., a male juvenile; and Carol Raths, Guardian Ad Litem of N.W., a female juvenile, Defendants.

No. 23065.

Supreme Court of South Dakota.

Argued on June 2, 2004.

Decided Sept. 21, 2005.

Rehearing Denied Oct. 24, 2005.

Kenneth R. Dewell, Gregory A. Eiesland of Johnson Eiesland Law Firm, Rapid City, South Dakota, Attorneys for plaintiff and appellant.

John Stanton Dorsey of Whiting, Hagg & Hagg, Rapid City, South Dakota, Attorneys for appellee R. Lehrkamp, Jr.

KONENKAMP, Justice.

[¶ 1.] Todd Heib was falsely accused, arrested, and jailed for eighty-six days on charges of kidnapping and rape. After the charges were dismissed, he successfully sued the three children who fabricated the story of their abduction. He also sued the deputy sheriff who led the investigation. The circuit court granted summary judgment for the deputy. On appeal, we conclude, under the totality of circumstances, that probable cause to arrest Heib existed as a matter of law because two of the children positively identified Heib as one of the perpetrators, medical examinations corroborated the children's accusations, and Heib had an incomplete alibi. Accordingly, we affirm.

## I.

[¶ 2.] It began on the afternoon of December 9, 1997. A female middle school student walked into a restroom at the Sturgis Community Center. There she found two classmates, ages 12 and 13, crying. She asked what was wrong, and with some hesitation on whether to reveal the source of their anguish, the two girls told their story. After hearing her classmates' account of being taken in a car to a remote location and raped, the student called her parents, and they in turn contacted the police.

[¶ 3.] At 4:30 p.m., Officer Hardman of the Sturgis Police Department met with the two girls and one of their parents at the Community Center. The girls were crying and "could not talk to" the officer. The Chief of Police directed that they be taken to the Law Enforcement Center to meet with Deputy Bob Lehrkamp, Jr. From then on, Deputy Lehrkamp became the lead investigator. In his initial report, Deputy Lehrkamp noted that the children were "upset, crying and scared." Believing that the girls needed each other's support, he decided to interview them together. During the interview, the girls told the deputy that while going to school together that morning along with the younger brother of one of the girls, the three were picked up by Josh Wisser in his car. One of the girls said that she recognized Wisser because she babysat his sister's children on occasion. The girls also said that another man was in the vehicle with Wisser. While the girls did not know the name of the other man, they said that they recognized him as someone who lived in the area. The girls also said they knew where this other man lived.

[¶ 4.] They told Deputy Lehrkamp that Wisser and the other man offered them a ride to school. Because of the weather, they accepted. Once in the car, the girls recounted that Wisser and the other man did not take them to school, but drove them to a parking lot at Fort Meade where Wisser sexually assaulted them. Deputy Lehrkamp asked the girls what they meant by sexually assaulted. One responded by pointing to her crotch. They showed him bruises on their arms that they said they received in the assault. They said that they were both sexually assaulted by Wisser and that the other man helped him do it. Upon request, the girls described Wisser's clothes and vehicle. They told how they spent the entire day in Wisser's car until he dropped them

off at their school around 3:30 p.m. Deputy Lehrkamp arranged for the girls to have medical exams at Rapid City Regional Hospital. Their parents drove them there.

[¶ 5.] Later that evening, Josh Wisser, age eighteen, was apprehended. His vehicle and clothing generally matched the description given by the girls. Wisser was informed of his rights and he agreed to speak with Deputy Lehrkamp. During the interview, Wisser admitted that he had previously been in trouble and was currently on probation for stalking a twelve-year-old girl. He said that he had worked the previous night and finished around 6:30 that morning. He then went over to the home of his friend, Todd Heib. Wisser admitted that he and Heib had driven in Wisser's car that morning. He told Deputy Lehrkamp that he had dropped Heib off at Bob Roush's home and then went to his own home around 10:00 a.m. Wisser admitted to giving the children a ride after dropping off Heib. He said that he drove the three around because they wanted to skip school. During that time they met with some of Wisser's friends as well as some of the children's friends. He explained that as the morning went on he decided to drop the children at their school because he did not want to get in trouble by helping them be truant. Wisser denied any sexual contact with the children.

[¶ 6.] Detective Dan Anderson of the Sturgis Police Department interviewed Bob Roush who said that Heib had been to his home that morning. He said that they had gone to breakfast and then to Heib's optometrist. Afterwards, Heib borrowed Roush's van to go to work. Detective Anderson then contacted Heib's employer, who confirmed that he had been at work that day. Anderson then noted in his report that "[i]f [Heib] was with Roush, at

the eye doctors and at work that day, [Heib] may not be our suspect."

[¶ 7.] Detective Anderson interviewed the eleven-year-old boy who was allegedly kidnapped and present during the sexual assaults on the two girls. The boy told the detective that they had been abducted, but that he had not witnessed the rapes because he was removed from the vehicle by one of the men. He also told the detective that the children had remained in the vehicle all day until dropped off at their school at 3:30 p.m. He gave a description of the man with Wisser that generally came close to Heib's description, but with discrepancies. He also said that this man smoked Marlboro Reds.

[¶ 8.] After his meeting with Wisser, Deputy Lehrkamp proceeded to the hospital where medical personnel were performing examinations on the girls. Deputy Lehrkamp spoke with two nurses who confirmed that the girls had been sexually assaulted. Doctor Michael Matthews wrote in his report that the twelve-year-old girl "was sexually assaulted I believe at about 8 a.m. this morning." In his gynecological exam, he found "minimal vulvar erythema" and "some whitish Wood's-positive material between the labia minora and the majora."[1] Whitish material was also found in the vaginal vault. His assessment: "Probable sexual contact. There are also multiple soft tissue ecchymoses." In his examination of the thirteen-year-old girl, Dr. Matthews noted that "[t]he alleged sexual contact occurred at 8 in the morning. She is not exactly sure on all the details of the assault." As to her gynecological exam, he noted that "[s]he has a little bit of whitish material present intralabially and that is the extent of the positives on the examination." But he found "Wood's-positive material" and collected it

1. A "Wood's Lamp" is an ultra violet light used in the detection of seminal fluid stains on the skin and hair of victims of sexual assault.

for evidence. In his assessment, Dr. Matthews wrote: "Alleged sexual contact. I think it is fairly likely." [2]

[¶ 9.] In the morning, Deputy Lehrkamp interviewed both girls a second time. The first to be re-interviewed was the twelve-year-old. She described the rape in greater detail. She explained that Wisser had forced her to remove her clothes; he then removed his own clothes, forced her to kiss him, and inserted his fingers and possibly his penis into her. She then stated that because of her struggling, she was unsure if Wisser actually penetrated her with his penis. The girl stated that both men and all three children were present in the vehicle during that time. The men told the girls that if they told anyone they would be killed. After the assault, the girl said that she could not recall much of the remainder of the day.

[¶ 10.] The thirteen-year-old girl's second interview that morning did not result in many further details. Deputy Lehrkamp reported that she was not feeling well, so he ended the interview early. Later Deputy Lehrkamp conducted a third interview. On this occasion, he described the information given to him as similar to that of the twelve-year-old's, yet he noted some discrepancies. After the interview, Deputy Lehrkamp had the girls take him to the location where the purported assault occurred. She directed him to a parking lot on Fort Meade located near the Veterans' Hospital.

[¶ 11.] Because some doubts existed in the officers' minds about whether Heib was the second assailant, Deputy Lehrkamp decided to prepare a photo lineup. Detective Anderson asked Heib to submit to a photograph. Heib agreed. Heib commented to Detective Anderson that "Bob [Roush] can tell you that I was with him when the rapes happened that morning." The detective found this curious because he had not told Heib about any rapes or when they were committed. Heib recalled Wisser mentioning to him, after he dropped him off, that Wisser was going to go back and give the three children they passed a ride. The detective mentioned to Deputy Lehrkamp that he noticed that Heib's features matched those described by the children and he was wearing clothes like those described as worn by the other man. Lehrkamp made the same observation and asked Heib if he was wearing these same clothes on the 9th. Heib answered that he was wearing the same coat, shirt, pants, shoes, hat, and belt. Detective Anderson asked Heib if he smoked. Heib said he did and pulled out a pack of Marlboro Reds.

[¶ 12.] At the photo lineup on December 11, 1997, the boy and the twelve-year-old girl identified Wisser and Heib as the assailants. The thirteen-year-old girl identified the photo of Wisser; however, she was only able to narrow the lineup to two potential individuals in the identification of the second male. One of the two was Heib. After the lineup, Deputy Lehrkamp told the deputy state's attorney that with the information he had and the "protective issue we have on this case," he was going to conduct a probable cause arrest of Heib. The deputy state's attorney agreed. Deputy Lehrkamp arrested Heib that evening without a warrant. It was his nineteenth birthday. He consented to an interview where he related an identical

---

2. The medical personnel and the investigators collected numerous items for laboratory testing from the three children. Investigators also collected many samples from Wisser, his impounded automobile, from Heib, and his residence. The record contains several forensic laboratory reports from the state lab and other agencies. The earliest report is dated January 20, 1998. No semen was found in any of the samples collected from the two girls.

version of events as Wisser. Heib said that they did not stop to speak with the children, and he could not explain why or how the children managed to describe his clothing or pick him from a lineup.

[¶ 13.] The Meade County Grand Jury was convened by the state's attorney on December 12, 1997. Each of the children related their stories to the grand jurors. Deputy Lehrkamp also testified. As a result, the grand jury indicted both Wisser and Heib.

[¶ 14.] Following the indictments, Detective Anderson again interviewed Roush on December 15. He noted in his report:

A result of this interview is that Roush can not say for sure where Heib was up to and maybe even later than 8:20 a.m. on the morning of the 9th. Josh and Heib could have picked up the three victims and taken them to [an] area by Fort Meade, committed the assaults and been back to Roush's to drop off Heib as early as 8:10. The three were picked up sometime around 7:40, giving thirty minutes for the trip out, the act and the drive back. Five minutes to go out, twenty minutes for the assaults and five minutes back to Roush's. This also can explain what the female victims stated to Lehrkamp. That the unknown suspect seemed like he was there one minute and gone the next. Heib could have met with Josh and the others several times that day. First thing in the morning before going to Roush's, before going to UBC some time before 10:00, on his way to the eye doctors around 10:00, after his eye appointment, while on his lunch break and after 3:00 when he left work for the day.

Detective Anderson felt that Roush's information was "questionable." Although Heib had an alibi for much of the remainder of the day during which the children claimed that he was riding around with them in Wisser's car, Roush could not provide an alibi for the critical time when the rapes occurred.[3] He could only say with certainty that Heib arrived at his home around 8:20 a.m., not 7:30 a.m. After obtaining a search warrant, Deputy Lehrkamp searched Heib's home and collected clothing and other items. The second assailant had been described as wearing a Marilyn Manson shirt. No such shirt was found. But the officers did find a belt buckle matching one described by one of the children.

[¶ 15.] A month later, on January 14, 1998, Wisser's attorney revealed that a private investigator had learned that the three children had been riding around with some other students during the day of the alleged rapes. The officers interviewed four students who said they were riding around with the three that day. When the officers confronted the boy, he admitted that he had misled them. However, he did not waiver from his story that the sexual assaults had occurred that morning and that he was held outside the car during the assaults. When asked by the officers why he had lied, the boy said that he wanted to make the case look better because he did not want Wisser and Heib to get away with it. On January 22, 1998, the state's attorney and deputy state's attorney met with the two girls, who continued to maintain that the rapes had occurred. They acknowledged, though, that the events fol-

---

3. Heib asserts that he had an alibi from his employer and others for most of the day when the children claimed that he was with them. But, as noted in one of Deputy Lehrkamp's reports, "The girls report that [Wisser] was around all the time and this phantom suspect later I.D. per photo line-up was there in the car then not in the car. The girls report they were both upset, crying and sleeping, so they don't have a great recollection of events after the assault."

lowing the rapes were not as they had previously related.

[¶ 16.] Finally, on April 10, 1998, one of the girls admitted to the deputy state's attorney that Heib was not present when the reported kidnapping and rapes occurred. She said that they added Heib to the story to make it more believable. On April 15, 1998, the state's attorney filed a dismissal of the charges against Heib.[4] On May 22, 1998, the grand jury reconvened. During testimony, one of the girls recanted her story entirely. However, the other boy and girl, brother and sister, maintained that their revised version was still true. As a result of this session, with the children's credibility now all but worthless, charges against Wisser were dismissed on May 26, 1998.

[¶ 17.] Wisser and Heib had been telling the truth all along. Although two of the children still stand by their version of events, it became clear in the end that the three children had made up the story to cover their absence from school. After Wisser had dropped them off, they went joyriding in a van with several boys who were also skipping school. If the medical evidence tended to show that the girls had sexual contact, it was because, as one of the girls later revealed, they both had had sexual relations with their boyfriends that afternoon. As for Heib, there can be no denying the harm brought down on him from the children's lies. The case garnered considerable publicity. He was required to wear a bulletproof vest to and from court appearances because of death threats against him. While in jail he was severely beaten by another inmate and spent much of his time in solitary confinement for his own protection. When he was released he found that his old job had been given to someone else. His reputation in the community was such that he had difficulty finding work and returning to the way things were before his arrest.

[¶ 18.] Heib sued the three children and Deputy Lehrkamp.[5] The complaint against the deputy averred false arrest, false imprisonment, malicious prosecution, negligent infliction of emotional distress, and intentional infliction of emotional distress. Deputy Lehrkamp moved for summary judgment on the ground that he had probable cause to arrest Heib. The circuit court ruled that probable cause for the arrest existed and granted Deputy Lehrkamp's motion. Heib appeals.

## II.

[¶ 19.] When reviewing a grant of summary judgment, we decide only whether there were genuine issues of material fact and whether the law was correctly applied. SDCL 15–6–56(c); *Keystone Plaza Condominiums Ass'n v. Eastep*, 2004 SD 28, ¶ 8, 676 N.W.2d 842, 846. Heib contends that summary judgment was inappropriate here because there were genuine issues of material fact. He reasons that because the children's statements were contradictory and because there were discrepancies in the evidence, material and genuine issues remain to be decided by a jury. Undeniably the evidence was contradictory in several key respects. However, those contradictions are not genuine issues of material fact because they are undisputed. And the fact that contradictory inferences can be drawn from these facts does not create a genuine issue of material fact because the question whether probable cause existed is a mixed question of law and fact for the court. *Ornelas v. United States*, 517 U.S. 690, 696–

---

4. Heib was released on bond in March 1998.

5. In a bench trial, the court found the children liable and awarded Heib a judgment totaling $150,000.

97, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *Cervantes v. Jones,* 188 F.3d 805, 811 (7thCir.1999). *See also* W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 119, at 882 (5th ed 1984). Furthermore, even if there were a dispute over facts relevant to probable cause, it will not preclude a finding of probable cause as a matter of law "so long as the finding survives after adopting the plaintiff's version of the disputed facts for which there is some support in the record." *Cervantes,* 188 F.3d at 811 (citations omitted). Considering all the facts in a light most favorable to Heib, we conclude that no genuine issue of material fact exists. It would be a different matter if it were disputed what Deputy Lehrkamp knew and did not know, and what he did or did not do. But that is not the case here. The record contains all the investigative and medical reports and everything provided to the grand jury. We know what he did and did not do. Thus, we can determine from the record whether, considering the conflicting evidence, Deputy Lehrkamp had probable cause to arrest Heib.[6] Indeed, as our Court wrote many years ago, "whether the undisputed facts are suffi-

cient to constitute probable cause is wholly a question of law. In consequence we must determine it for ourselves as if the case had been heard here." *Brown v. Keyes,* 54 S.D. 596, 223 N.W. 819, 820 (S.D.1929).[7]

### III.

■ [¶ 20.] False arrest is one of several means of committing the tort of false imprisonment. DAN B. DOBBS, THE LAW OF TORTS § 36, at 67 (2000). False arrest "describes the setting for false imprisonment when it is committed by [a law enforcement] officer...." *Id.* The Fourth Amendment requires that arrests be based on probable cause. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). This requirement is embodied in our statutes. SDCL 23A–3–2 provides:

> A law enforcement officer may, without a warrant, arrest a person:
>
> (1) For a public offense, other than a petty offense, committed or attempted in his presence; or
>
> (2) Upon probable cause that a felony or Class 1 misdemeanor has been committed and the person arrested

---

**6.** The dissent suggests that probable cause determinations are "generally not appropriate for summary judgment." Nonetheless, although perhaps anomalous in the field of negligence, the "overwhelming weight of authority" holds that the question of probable cause in an action for malicious prosecution is for the court. C.C. Marvel, Annotation, *Probable Cause or Want Thereof, in Malicious Prosecution Action, as Question of Law for Court or of Fact for Jury,* 87 A.L.R.2d 183, § 2; 3(a). Even the authority the dissent cites tends to undermine its argument. In one of its cited 42 USC § 1983 actions, and despite the quote the dissent extracts, the court ruled that probable cause existed when the "facts and circumstances [were] uncontroverted." *Warren v. City of Lincoln,* 864 F.2d 1436, 1439, 1441 (8thCir.1989) ("we conclude that probable cause existed to arrest Warren for attempted

burglary"). And in *McKenzie v. Lamb,* 738 F.2d 1005, 1008 (9thCir.1984), another case the dissent cites, the court suggested, though it ultimately left the question to the district court, that it could rule as a matter of law that "the plaintiffs would be entitled to summary judgment" on the issue of probable cause.

**7.** One court framed the majority rule rather well:

> What facts and circumstances constitute probable cause is a pure question of law; whether they exist is a pure question of fact. The question of whether probable cause exists is thus a jury issue only when material facts are in controversy.

*LeGrand v. Dean,* 564 So.2d 510, 512 (Fla. Dist.Ct.App.1990) (citations and internal citation omitted).

committed it, although not in the officer's presence.

*Id.*

[¶ 21.] The existence of probable cause to arrest is a complete bar to false arrest and malicious prosecution claims. This is because proof of the absence of probable cause is an essential element in both causes of action. *Just v. Martin Bros. Co.*, 37 S.D. 470, 159 N.W. 44, 46 (1916);[8] *see Kredit*, 68 S.D. at 283–84, 1 N.W.2d at 817. *See also* RESTATEMENT (SECOND) OF TORTS § 673 (1977) (malicious prosecution). The burden of proving that the arrest was illegal or without probable cause always remains with the plaintiff. *McGillivray*, 278 N.W.2d at 799–800 n2. Law enforcement officers have probable cause to arrest if "the facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck*, 379 U.S. at 91, 85 S.Ct. 223 (citations omitted); *see also McGillivray*, 278 N.W.2d at 798. Probable cause lies somewhere between mere suspicion and the trial standard of beyond a reasonable doubt. *See Beck*, 379 U.S. at 91, 85 S.Ct. 223; CHARLES H. WHITEBREAD & CHRISTOPHER SLOBOGIN, CRIMINAL PROCEDURE § 3.03 (4th ed 2000).

[¶ 22.] Heib presented evidence from an expert witness who opined that Deputy Lehrkamp did not have probable cause. As we indicated above, however, the existence of probable cause is a legal question. Accordingly, the expert's opinion has no place in our analysis. *See, e.g., Specht v. Jensen*, 853 F.2d 805, 807 (10thCir.1988) ("A witness cannot be allowed to give an opinion on a question of law."); *Sheldon Appel Co. v. Albert & Oliker*, 47 Cal.3d 863, 254 Cal.Rptr. 336, 765 P.2d 498, 510–11 (1989) (expert testimony inadmissible on issue of probable cause in malicious prosecution suit where it was alleged that defendants failed to adequately investigate claim before bringing suit).

[¶ 23.] An arresting officer is required to conduct a reasonable investigation to establish probable cause. *Tillman v. Coley*, 886 F.2d 317, 321 (11th Cir.1989). "Where it would appear to a 'cautious man' that further investigation is justified before instituting a proceeding, liability may attach for failure to do so, especially where the information is readily obtainable, or where the accused points out the sources of the information." *Harris v. Lewis State Bank*, 482 So.2d 1378, 1382 (Fla.Dist.Ct. App.1986). An officer, however, need not take "'every conceivable step . . . at whatever cost, to eliminate the possibility of

---

8. In *Just,* we recited the required elements for proving malicious prosecution:

"(1) The commencement or continuance of an original criminal or civil judicial proceeding; (2) its legal causation by the present defendant against plaintiff, who was defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; (6) damage conforming to legal standards resulting to plaintiff."

*Just,* 159 N.W. at 46. As for false arrest, also referred to as false imprisonment, this Court wrote:

The essential elements of false imprisonment are: "(1) the detention or restraint of one against his will, and (2) the unlawfulness of such detention or restraint." 32 AMJUR2D *False Imprisonment* § 5, at 77. False imprisonment contains two elements, namely, detention or restraint of a person, and unlawfulness of such restraint or detention. *Catencamp v. Albright*, []251 N.W.2d 190[, 191 (S.D.1977)].

*McGillivray v. Siedschlaw*, 278 N.W.2d 796, 801 (S.D.1979) (Henderson, J., concurring specially). Generally, in either action, the plaintiff must prove the absence of probable cause. *See Kredit v. Ryan*, 68 S.D. 274, 1 N.W.2d 813, 817 (1942).

convicting an innocent person...." *Tillman*, 886 F.2d at 321 (quoting *Baker v. McCollan*, 443 U.S. 137, 145, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). "In order to establish the probable cause necessary to make a valid arrest, ... it is not necessary to eliminate all possible defenses." *State v. Riehl*, 504 So.2d 798, 800 (Fla.Dist.Ct. App.1987). Once an officer makes an arrest based upon probable cause, the officer "need not 'investigate independently every claim of innocence.'" *Tillman*, 886 F.2d at 321 (citation omitted). Furthermore, "'[i]f there are sufficient facts to warrant an ordinarily prudent person in believing that another has committed a crime, failure to make further investigation before instituting a prosecution does not constitute a want of probable cause.'" *Koski v. Vohs*, 426 Mich. 424, 395 N.W.2d 226, 232 (1986) (quoting R.C.L., Annotation, *Institution of Prosecution on False Information Without Investigation as Showing Lack of Probable Cause*, 5 ALR 1688 (1919)).

[¶ 24.] The existence of probable cause is measured as of the moment of the arrest, not on later developments. *Beck*, 379 U.S. at 93, 85 S.Ct. 223. An officer need not be certain of the outcome of a criminal proceeding to have probable cause for arrest. A later acquittal is irrelevant to the determination of probable cause. *Michigan v. DeFillippo*, 443 U.S. 31, 36, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). Probable cause may be based on any information of such a character as an ordinarily cautious person would feel authorized to act upon in similar circumstances, including information received from others. WHITEBREAD, *supra*, § 3.03. In our analysis, probable cause depends on the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Determinations of whether probable cause exists are made in light of the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230–31, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Thus our inquiry comes down to asking whether an objectively reasonable person would have understood that Heib's arrest was merited based on the facts available after a reasonable investigation.

[¶ 25.] At the time of Heib's arrest, the three children had related substantially similar stories to Deputy Lehrkamp and other officers. Certain aspects of the children's stories did conflict—such as descriptions of clothing, facial hair, and hair color, and whether the boy was inside or outside of the car during the rapes—and Deputy Lehrkamp noted those conflicts in his reports. However, it would be reasonable for a trained law enforcement officer to attribute the inconsistencies to the children's ages and their apparent emotional state. In one sense, the inconsistencies can be said to make their stories more believable. Three identical stories might lead one to conclude that the stories were rehearsed. Each of the three children identified Wisser as one of the perpetrators. Each of the children accurately described Wisser's clothes and his vehicle. Unfortunately for Wisser, his recent involvement with the law only bolstered the children's rendition: he was on probation for stalking a twelve-year-old girl.

[¶ 26.] Wisser told the detectives that he and Heib had been together in the vehicle at approximately the time the assault was alleged to have occurred. Heib admitted that he was in the vehicle with Wisser only minutes before the children were picked up. Two of the children identified Heib as the second perpetrator in a photo lineup. With the exception of the Marilyn Manson tee shirt, which one of the children said Heib was wearing, the children closely described the clothing Heib

wore that day. Medical examinations of the two girls appeared to confirm that they had had sexual contact. The examinations also showed that the girls had bruises and scratches. Of some significance also is the fact that at the time Deputy Lehrkamp arrested Heib there appeared to be a need for prompt action. According to the children, the perpetrators had threatened that they would kill them if they revealed what happened.

## IV.

[¶ 27.] Against these circumstances stood Heib's alibi. It is here that Heib concentrates much of his criticism of Deputy Lehrkamp's investigation. Deputy Lehrkamp did not fully present Heib's alibi to the grand jury. Yet it must be kept in mind, initially, that law enforcement officers testifying as witnesses are not permitted simply to give narrative reports in state grand jury proceedings. Presentation of evidence is controlled by the prosecutor's questions. No question was put to Deputy Lehrkamp from the prosecutors about the statements taken from Heib's alibi witnesses. This is true despite the fact that the prosecuting attorneys had the benefit of the investigation by Deputy Lehrkamp and Detective Anderson describing what Heib told them concerning his whereabouts and what Roush and Heib's employer said.

[¶ 28.] During the grand jury proceedings, the only question to Deputy Lehrkamp concerning Heib's alibi came from one of the grand jurors, who asked if anyone had seen Wisser and Heib at their homes at the times they said they were there. Deputy Lehrkamp responded, "There are people reporting that they were there at that time, yes, but we're in the middle of that right now." The record shows that

Deputy Lehrkamp and Detective Anderson investigated Heib's alibi both before and after the indictments were handed down. All the information was contained in their reports. So there can be no suggestion that Deputy Lehrkamp simply ignored the alibi claim.[9]

[¶ 29.] In cases where it is alleged that officers failed to properly investigate a suspect's alibi, liability may be avoided by showing its inconclusiveness. *Gisondi v. Harrison*, 72 N.Y.2d 280, 532 N.Y.S.2d 234, 528 N.E.2d 157, 160–61 (1988). At the critical time when the children were allegedly raped, Heib had no witness, other than his purported accomplice, who could corroborate his statement that he was not in the car.

## V.

[¶ 30.] Heib points to other inconsistencies as demonstrating that Deputy Lehrkamp lacked probable cause. For example, the child that the girls first talked to in the bathroom about the rapes reported to police that the girls mentioned being taken to a house and tied up. When asked about this, Detective Anderson, who interviewed this child, explained that children in reporting events often get things out of order and embellish, and that it is necessary to go to the source and not rely on second-hand information. In our review of this child's statement, she first told detectives that the girls said they were forced into the car, but on further questioning she changed her mind and said that the girls reported being invited to get into the car. Heib also points to the inconsistencies in the children's descriptions of the second assailant, especially in the beginning. Nonetheless, two of the three identified Heib in a photo lineup.

9. Another complicating circumstance is the fact that Wisser's mother gave him an alibi that proved to be completely false.

[¶ 31.] It is enough to say that much evidence was presented to Deputy Lehrkamp that might have cast some doubt on the veracity of the children's statements and other evidence he had obtained. However, whether there would be some doubt in a reasonable person's mind is not the appropriate inquiry. The record reflects that both Deputy Lehrkamp and Detective Anderson had reservations on whether Heib was the second individual. However, officers are not required to rid themselves of all doubt before proceeding to an arrest based on probable cause. Proof beyond a reasonable doubt is not the standard. If the officers found the children to be believable, the officers might have been justified in making an arrest on their statements alone. After all, even in the courtroom, corroboration of testifying sex crime victims is not an evidentiary requirement. *See State v. Cates*, 2001 SD 99, ¶ 10, 632 N.W.2d 28, 34 n. 6 (citing *State v. Gonzalez*, 2001 SD 47, ¶ 18, 624 N.W.2d 836, 840–41). But the officers went much further than that.

[¶ 32.] Heib points to the children's changes in their stories as proof that probable cause did not exist. We agree that those changes caused the children's credibility to diminish. However, the changes were explained by the children. A reasonable person might attribute this to the children's immaturity or lack of understanding. Furthermore, the changes seemed to fit within the officer's theory of the case. The officers had already questioned whether Wisser might not have dropped off Heib soon after the alleged rapes. One Florida court ruled in a malicious prosecution case that it was sufficient for the defendant detective to initiate prosecution based on statements from the alleged victim because "[i]n many, if not most, sexual battery or sexual assault cases the victim is the sole witness as to the identity of her attacker and as to the facts and circumstances of the assault."

*Lee v. Geiger*, 419 So.2d 717, 719 (Fla.Dist. Ct.App.1982). There, the plaintiff claimed that the detective had failed to investigate "his 3:00 a.m. alibi for the 4:00 a.m. alleged assault[.]" *Ware v. United States*, 971 F.Supp. 1442, 1470 (M.D.Fla.1997) (addressing and following the decision of *Lee*, 419 So.2d at 719).

[¶ 33.] Deputy Lehrkamp was managing an investigation in which the only actual witnesses to the alleged crime were three children. A reasonable law enforcement officer would expect a child's rendition of events to have inconsistencies. Even adult recollections of traumatic events can often be inconsistent. Child sexual assault cases are among the most difficult to investigate. *See Rankin v. Evans*, 133 F.3d 1425, 1442 (11thCir.1998) (malicious prosecution action against officer on false child sex abuse charge: court ruled that probable cause existed as a matter of law). In *Rankin*, the court found that although a three-year-old child had made some statements undermining her credibility, a prudent officer could have reasonably relied on her "fundamental allegation" consistently made that a man at her daycare had sexually abused her. *Id.* at 1443. Like our case, *Rankin* had evidence of medical corroboration of sexual abuse.

[¶ 34.] In a malicious prosecution action, some weight must also be given to the fact that after his arrest Heib was indicted by a grand jury. According to the RESTATEMENT (SECOND) OF TORTS § 664(2) (1977), "[t]he indictment of the accused by a grand jury is evidence that the person who initiated the proceedings had probable cause for initiating them." In some jurisdictions, a grand jury indictment creates a presumption of probable cause. *Colon v. City of New York*, 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248, 1250 (1983). We see no reason to diverge from

the Restatement rule, however, since the burden always remains with the plaintiff to prove the absence of probable cause.

## VI.

[¶ 35.] Lastly, Heib contends that Deputy Lehrkamp should be held accountable for continuing the prosecution after the children's stories began to unravel in January 1998. In some jurisdictions, one of the elements of malicious prosecution includes the "commencement or *continuation* of a criminal proceeding." *See, e.g., Kochis v. Revco Pharmacy,* 9 A.D.3d 449, 779 N.Y.S.2d 923, 923 (N.Y.App.Div.2004) (adhering to *Colon,* 468 N.Y.S.2d 453, 455 N.E.2d at 1250) (emphasis added). Heib cites two federal § 1983 tort actions to support his argument that a law enforcement officer can be held liable for continuing to prosecute after exculpatory facts have been discovered. *See Jones v. City of Chicago,* 856 F.2d 985 (7thCir.1988), and *Ware,* 838 F.Supp. 1561. These cases describe acts conducing to intentional suppression of exculpatory facts up to and including the trial. In *Jones,* Chicago police officers were deliberately "deep-sixing" exculpatory evidence. 856 F.2d at 993. The court concluded that "[i]f the prosecutors had known of [this] evidence, they would almost certainly have dropped the charges. . . ." *Id.*

[¶ 36.] In *Ware,* the court ruled, citing *Jones,* that continued prosecution after discovery of exculpatory facts by a special agent of the FBI who was actively involved in the investigation and in formulating strategy for the prosecution's case could be a basis of claim of malicious continuation of prosecution or false imprisonment, under the Federal Tort Claims Act, despite the fact that the grand jury indicted the plaintiff and there existed probable cause for the arrest. 838 F.Supp. at 1563–64. The court held that a showing of probable cause for arrest did not insulate or immunize the special agent for his ac-

tions leading up to suspect's wrongful conviction and imprisonment. The agent was alleged to have "purposely withheld information relating to the fingerprint test results from Plaintiff at trial, even though it was relevant, exculpatory, and would have completely undermined the Government's theory that the Plaintiff was the 'money man' in a drug operation." *Id.* at 1563.

[¶ 37.] Here, in contrast, it is clear from the record that Deputy Lehrkamp kept the prosecutors aware of ongoing information he received concerning the children's changing facts. For example, when the eleven-year-old boy was confronted with the results of the defense attorney's investigation on January 14, 1998, and the boy recanted part of his story, Deputy Lehrkamp prepared a written report in which he noted, "[t]his information was then presented to the Meade County State's Attorney verbally." Once the indictments were handed down, the decision whether to proceed or not rested with the prosecutors. "[A] malicious prosecution action will not lie where a prosecuting attorney is left to judge the propriety of proceeding with the charge and acts on his own initiative in doing so." *Walsh v. Eberlein,* 114 Ariz. 342, 560 P.2d 1249, 1252 (Ct.App.1976). When the children changed their stories, Deputy Lehrkamp reported these events to the prosecutors. The ultimate decision to seek dismissal of the charges belonged to them.

[¶ 38.] The remainder of Heib's arguments lack sufficient merit for discussion.

## VII.

### Conclusion

[¶ 39.] Three children lied about a crime that never happened. For awhile, they managed to deceive everyone. They fooled law enforcement officers, doctors, nurses, prosecutors, grand jurors, and

even their parents. They convinced professionals from multiple disciplines that they had been kidnapped and that two of them had been raped. All three children identified Josh Wisser as one of the two perpetrators. And two identified Todd Heib as the other. In the role of lead investigator, Deputy Lehrkamp interviewed the children several times, arranged to have the girls medically examined, collected numerous items for forensic testing, contacted many potential witnesses, interrogated both Wisser and Heib, and obtained statements from the people they named as providing an alibi. He presented his information to the prosecuting attorneys, who in turn presented the case to the grand jury. As a result, two innocent men were falsely charged.

[¶ 40.] Fortunately, the children's lies were uncovered. To the extent that Wisser and Heib were not wrongfully convicted, the system worked, but it did not work fast enough. They spent many weeks in jail. Despite their difficult ordeal, however, we cannot judge this case with the advantage of hindsight. All the complex and contradictory facts must be evaluated as they unfolded before the officers. In light of the totality of circumstances confronting Deputy Lehrkamp at the time, we conclude that there were objective facts establishing probable cause to arrest. Therefore, the circuit court properly granted summary judgment.

[¶ 41.] Affirmed.

[¶ 42.] GILBERTSON, Chief Justice, and ZINTER, Justice, concur.

[¶ 43.] SABERS and MEIERHENRY, Justices, dissent.

SABERS, Justice (dissenting).

[¶ 44.] The majority opinion suffers from the same deficiencies as the circuit court's memorandum opinion—a failure to view the facts and inferences in the light most favorable to Heib. These problems combine to produce two disconcerting results. First, a man who was falsely accused, arrested, and jailed has been denied his right to a jury trial. Second, it destroys our longstanding precedent involving summary judgment.

**Standard of Review**

[¶ 45.] Our standard of review on summary judgment was, prior to the majority's decision, "well settled." *Thornton v. City of Rapid City,* 2005 SD 15, ¶ 4, 692 N.W.2d 525. The moving party has the burden to show that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. *Williams v. Vandeberg,* 2000 SD 155, ¶ 7, 620 N.W.2d 187. The evidence must be viewed in the light most favorable to the non-moving party. *Colonial Ins. Co. of California v. Lundquist,* 539 N.W.2d 871, 873 (S.D. 1995). All inferences from the evidence must also be viewed in favor of the non-moving party. Thus, "summary judgment requires not only that there be no material facts at issue, but also that there be no genuine issue on the *inferences* to be drawn from those facts." *St. Onge Livestock Company, Ltd., v. Curtis,* 2002 SD 102, ¶ 10, 650 N.W.2d 537 (quoting *Mueller v. Cedar Shore Resort, Inc.,* 2002 SD 38, ¶ 10, 643 N.W.2d 56, 61–62 (emphasis added)); *St. Paul Fire & Marine Insurance Co., v. Engelmann,* 2002 SD 8, ¶ 15, 639 N.W.2d 192, 199 ("Not only must the facts not be in issue, but also there must be no genuine issue on the inferences to be drawn from those facts"); *Wilson v. Great N. Ry. Co.,* 83 S.D. 207, 157 N.W.2d 19, 21 (1968).

[¶ 46.] Summary judgment was never meant to be a substitute for a trial by jury. *Jerauld County v. Huron Regional Medical Center, Inc.,* 2004 SD 89, ¶ 9, 685 N.W.2d 140, 142. Instead, this Court has recognized that summary judgment is an extreme remedy and should only be grant-

ed "when the truth is clear." *Id.* It is inappropriate to affirm a trial court's grant of summary judgment merely because we might believe the non-moving party would not have prevailed at trial. *Wulf v. Senst,* 2003 SD 105, ¶ 17, 669 N.W.2d 135, 141.

[¶ 47.] Probable cause to arrest exists if "the facts and circumstances within their [the arresting officer's] knowledge and of which they [have] reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck,* 379 U.S. at 91, 85 S.Ct. 223. "The principal components of a determination of ... probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to ... probable cause." *Ornelas,* 517 U.S. at 696, 116 S.Ct. 1657.

[¶ 48.] In this case, we are reviewing an appeal from summary judgment where the trial court determined that probable cause existed as a matter of law. Probable cause does not lend itself to summary judgment in the context of false arrest and malicious prosecution because it involves application of the "reasonably prudent person standard." This Court has long held that summary judgment is generally not amenable to such issues.[10]

[¶ 49.] Other courts distinguish between probable cause in the civil and criminal realm and acknowledge that the issue is generally not appropriate for summary judgment. Justice Kennedy, during his tenure with the Ninth Circuit, wrote:

> Our task in determining whether probable cause to arrest existed as a matter of law in this § 1983 action is slightly different from a similar determination in the context of a direct review of a criminal arrest. In the latter situation, we are called upon to review both law and fact and to draw the line as to what is and is not reasonable behavior. We are not always in agreement as to its location, but a line must be drawn. By contrast, in a § 1983 action the factual matters underlying the judgment of reasonableness generally mean that probable cause is a question for the jury, and summary judgment is appropriate only if no reasonable jury could find that the officers did or did not have probable cause to arrest.

*McKenzie v. Lamb,* 738 F.2d 1005, 1007–1008 (9th Cir.1984). Former Chief Justice Wollman, writing for the Eighth Circuit, noted that the issue of probable cause in a suit for money damages becomes a question of law only when "the facts are not disputed or are susceptible to only one reasonable inference ..." *Warren v. City of Lincoln,* 864 F.2d 1436, 1439 (8th Cir. 1989) (quoting *Linn v. Garcia,* 531 F.2d 855, 861 (8th Cir.1976)). In another Eighth Circuit decision, the Court affirmed a district court's denial of summary judg-

---

**10.** In *Satterlee v. Johnson,* we noted that:

Summary judgment is generally not feasible in negligence cases because the standard of the reasonable man must be applied to conflicting testimony ... it is only when the evidence is such that reasonable men can draw but one conclusion from facts and inferences that they become a matter of law and this occurs rarely. 526 N.W.2d 256, 258 (S.D.1995) (quoting *Lamp v. First Nat. Bank of Garretson,* 496 N.W.2d 581 (S.D.

1993)); *See also Wilson v. Great Northern Railway Co.,* 83 S.D. 207, 157 N.W.2d 19, 22 (S.D.1968) (Noting that summary judgment is appropriate on issues of contributory negligence and the reasonable person standard only in the "extraordinary, unusual, or rare case where the facts are conceded or demonstrated beyond reasonable question and show a right to summary judgment with such clarity as to leave no room for controversy.")

ment on the issue of probable cause, stating, "it is settled doctrine that any inferences to be drawn ... must be viewed in the light most favorable to the party opposing the motion ..." *Giordano v. Lee,* 434 F.2d 1227, 1231 (8th Cir.1970).[11]

[¶ 50.] In this case, the trial court found that one of the undisputed facts supporting summary judgment was that "consistent versions of the offenses [had been] repeatedly provided by all three victims to friends, investigating officers, parents, and medical professionals before Heib's arrest ..." The trial court mischaracterizes this statement when it refers to it as "an undisputed fact." What it is, of course, is an inference the trial court drew based on the underlying facts. Because the court's inference was made in the light most favorable to the moving party, it was an inappropriate inference for purposes of summary judgment. An examination of the record indicates that the trial court's inference, in addition to being inappropriate, is simply inaccurate.

[¶ 51.] The majority opinion avoids reconciling the trial court's improper inference with the record. In fact, the majority opinion concedes that issue by stating that "the evidence was contradictory in several key respects." The majority opinion continues by writing:

However, those contradictions are not genuine issues of material fact because they are undisputed. And the fact that *contradictory inferences can be drawn from these facts* does not create a genuine issue of material fact because the question [of] whether probable cause existed is a mixed question of law and fact *for the court.*

(emphasis added) (citations omitted). Although probable cause is a mixed question of law and fact, it is not always "for the court" when "contradictory inferences can be drawn from [the] facts." [12]

[¶ 52.] Having determined the correct standard, whether Lehrkamp was entitled to summary judgment should be viewed with all facts and inferences in the light most favorable to Heib. SDCL 15–6–56(c).

### Analysis

[¶ 53.] The three juveniles' stories were inconsistent. The only thing consistent about their stories was the claim that Wisser and an unnamed man committed sexual assaults and then drove them around until about 3:30 P.M. Even their descriptions of how the assault took place were inconsistent.

[¶ 54.] Detective Anderson interviewed the teenaged girl who's father reported

11. *See also Brewer v. Fischer,* 144 Neb. 712, 14 N.W.2d 315, 318 (1944) (Probable cause in a malicious prosecution action is a question for the jury when "reasonable minds could differ on the facts proved"); *Harmon v. Redding,* 135 Ga.App. 124, 218 S.E.2d 32, 33 (1975) (Probable cause in a malicious prosecution case is always a question for the jury unless it is "obvious" to the court it does or does not exist); *Kimbrough v. Giant Food Inc.,* 26 Md.App. 640, 339 A.2d 688, 693 (1975) (When facts are disputed or more than one inference can be drawn, issue of probable cause must be submitted to the jury); *Parkin v. Cornell University,* 78 N.Y.2d 523, 577 N.Y.S.2d 227, 230, 583 N.E.2d 939 (1991) ("Probable cause is a question of law to be decided by the court only where there is no

real dispute as to the facts or the proper inferences to be drawn from such facts").

12. The majority opinion continued in what seemed to be an attempt to "hedge its bet" by writing, "even if there were a dispute over facts relevant to probable cause, it will not preclude a finding of probable cause as a matter of law so long as the finding survives after adopting the plaintiff's version of the disputed facts for which there is some support in the record." (citing *Cervantes v. Jones,* 188 F.3d 805, 811 (7th Cir.1999)) (overruled on other grounds). *Cervantes,* however, does not stand for the proposition that reasonable inferences can be made against the non-moving party in an appeal from summary judgment, nor am I aware of any case that does.

this incident to the Sturgis Police. It is undisputed that this girl was the first person that the juveniles spoke to about the alleged rape and kidnapping incident. During the interview, the girl told Detective Anderson that the alleged victims had said that they were driven to Fort Meade, brought into a house, and raped. She also told Detective Anderson that she had been told that one of the alleged victim's little brother had been "tied up" or held back during the rapes. Although the three juveniles later told authorities they were raped in a car, they were never asked to explain this discrepancy.

[¶ 55.] The juveniles' descriptions of the unnamed accomplice were also inconsistent. One girl described the accomplice as having "shoulder length brown hair and a heavy brown mustache." She claimed that he had been wearing a "black Marilyn Manson t-shirt," "black pants," and "old black shoes." The second girl described him as having "reddish shoulder length hair" with "no facial hair." She did not recall the type of shoes he was wearing. Additionally, she claimed that on the day in question he was wearing a "white shirt" with "blue jeans." During the interview, the second girl claimed to have gotten sick after being questioned about the different seating arrangements in the vehicle. As a result, Lehrkamp terminated the interview and decided to continue it the following morning.

[¶ 56.] Lehrkamp resumed the interview the following day at 11:00 A.M. He noticed that the second girl brought notes with her. When Lehrkamp inquired about the notes, she commented on a vision she had had the night before:

> *Lehrkamp:* Now the information that you read to us here that you have written down, like I told you before I would like to get that if that's o.k.
> *Girl:* Yah.
> *Lehrkamp:* Before we leave, alright?

*Girl:* And I did make a mistake on what that guy was wearing.

*Lehrkamp:* Oh o.k.

*Girl:* Cause I had a dream you know.

*Lehrkamp:* Alright.

*Girl:* And then I wrote all of it down.

Miraculously, the girl's story now perfectly matched that of the other two alleged victims'. She described the unnamed suspect as wearing a "black Marilyn Manson t-shirt," "black pants," and "old black shoes." Officer Lehrkamp never questioned her about "the dream" or how her descriptions of the unnamed suspect could change overnight.

[¶ 57.] Todd Heib's story, on the other hand, remained consistent and corroborated throughout Lehrkamp's investigation. Wisser told Lehrkamp that he had dropped Heib off at Bob Roush's house at 7:45 A.M. and that Heib was not with him when he picked up the juveniles. As a result, Lehrkamp sent Detective Anderson to the Roush residence to conduct an interview.

[¶ 58.] Roush told Anderson that Heib had indeed been dropped off at his house at about 8:00 A.M. on the morning in question. Thereafter, Heib and Roush went to McDonald's for breakfast. Roush then took Heib to the optometrist. Finally, Heib borrowed Roush's vehicle and went to work at UBC.

[¶ 59.] Detective Anderson contacted Scott Palmer and T.J. Beckman, both UBC employees, who confirmed that Heib had been at work. Beckman told Anderson that he remembered Heib mentioning that he would be running late because of an eye exam. Anderson then acquired Heib's time card which indicated he started work at 11:30 A.M, went to lunch at noon, and was back at 12:30 P.M. Heib punched out for the day at 3:00 P.M.

[¶ 60.] Anderson found Heib's story to match the accounts given by Roush, Palmer, and Beckman. Based on these interviews, Detective Anderson concluded that "Heib may not be our suspect." He also recommended to Lehrkamp that Heib's alibi was something that had to be investigated before an arrest was made.

[¶ 61.] Despite that warning, Lehrkamp conducted a photo lineup the next day in which two of the three juveniles identified Heib as the unnamed accomplice. Lehrkamp arrested Heib that evening without obtaining a warrant. No further investigation had been conducted concerning Heib's alibi. Detective Anderson was not involved in Lehrkamp's decision to arrest Heib.

[¶ 62.] In affirming the circuit court, the majority opinion relies heavily upon the following facts and inferences:

1. That two of the three juveniles picked out Heib from the lineup.
2. That a subsequent interview of Bob Roush, conducted on December 15th, revealed that Heib may not have arrived at Roush's home until as late as 8:20 A.M.
3. That a supplemental report by Detective Lehrkamp, written on December 22, repeats a claim by one of the juveniles who said the unnamed accessory was "there in the car and then not there."
4. Inconsistencies and conflicts in the testimony actually bolster credibility.
5. That a reasonable law enforcement officer would expect children to give inconsistent accounts of the same event.
6. That the medical evidence aided in establishing probable cause for the arrest of Heib.

I will address each of the majority opinion's arguments in turn.

### [¶ 63.] 1. The Lineup Identification.

[¶ 64.] The majority opinion relies heavily upon the fact that two out of three juveniles identified Heib from a photo lineup. However, there is a dispute as to whether the two juveniles would have prior reason to know or identify Heib. Lehrkamp maintains that he had no reason to suspect that the juveniles would be able to recognize Heib prior to the lineup. Heib argues that he was neighbors with two of the three juveniles and that they would easily recognize him from a photograph.

[¶ 65.] An examination of the record supports Heib's argument. Lehrkamp conducted the photo lineup on December 11th. During an interview on December 10th, Lehrkamp engaged in the following exchange with the second girl:

*Lehrkamp:* O.k., now, let me ask you this, when it comes to these two guys, if I was to show you a lineup, a photo lineup could you identify em?

*Girl:* Yes I could.

*Lehrkamp:* You would be very comfortable on that?

*Girl:* I would.

*Lehrkamp:* O.k., alright and you think you know where this other guy lives?

*Girl:* Yes I do.

*Lehrkamp:* O.k., um and ah if we need to maybe I will get you and we will go drive around and you can, have you seen this guy living there or something?

*Girl:* I have seen him in his house, yes.

*Lehrkamp:* O.k., but you don't know who he is?

*Girl:* No.

*Lehrkamp:* O.k., alright so maybe a little bit later we will go and you guys can show me, does [the other girl] know where this guy lives?

*Girl:* Yes he lives right across the street from her.

*Lehrkamp:* Oh he does?

*Girl:* Umum.

In addition to the interview transcript, the addresses on record show that Heib lives on the same street as two of the three juveniles.

[¶ 66.] This evidence is contrary to Lehrkamp's assertion that he had no reason to suspect that the juveniles would have prior reason to know or identify Heib. Indeed, the evidence gives rise to an inference that the only reason two of the three juveniles identified Heib is because they were his neighbors. Therefore, the majority's confidence in the lineup identification is misplaced.

[¶ 67.] **2. and 3. Subsequent Interview with Roush & Lehrkamp's Supplemental Report.**

[¶ 68.] Probable cause must arise before an arrest is made. *Beck,* 379 U.S. at 93, 85 S.Ct. 223. Facts learned after the arrest will not retroactively make the arrest lawful. As a result, anything learned by law enforcement subsequent to Heib's arrest is irrelevant, except that it may tend to show bias or an attempt by Lehrkamp to cover his actions.

[¶ 69.] Heib was arrested on December 11th. On December 15th, Detective Anderson conducted a second interview with Bob Roush. Roush repeated what he had told Anderson in the prior interview; that Heib arrived at his home around 8:00 A.M. on the day the alleged rapes occurred. However, Anderson notes that after "nailing down times" Bob "admitted it could have been as late as 8:20 A.M. when Heib arrived." The additional twenty minutes, according to Anderson, could have allowed Heib to commit the crimes at Ft. Meade and return to Roush's home. Anderson also believed this evidence corroborated a victim's statement to Lehrkamp that the unnamed suspect was "there in the car and then not there."

[¶ 70.] There was no reference to the latter statement in Lehrkamp's original report. The first time it surfaced was in Anderson's report of his second interview with Roush. The supplemental report was used to attempt to weaken Heib's alibi. According to Lehrkamp and Anderson, Heib could have been continually going back and forth to Wisser's car during the following times:

- First thing in the morning before going to Roush's
- On the way to his eye appointment
- Just prior to going to work at UBC
- During his one-half hour lunch break
- And between 3:00 P.M. when he left work, until 3:30 when the kids were dropped off at school.

Even if there were evidence to support their theory, it would still be extremely difficult for a reasonable person to accept such possibilities. However, the record is clear that Lehrkamp did not even consider these possibilities before his arrest of Heib.

[¶ 71.] Both of the reports by Anderson and Lehrkamp were made subsequent to Heib's arrest. Lehrkamp did not mention the unnamed subject coming and going during the day in question. In Anderson's report on December 9th, he wrote:

At this point in the investigation and based only on what information we had on the incident from the first interviews with the victims, it appeared the unnamed suspect was with Josh from the time the three juveniles were picked up till they were released sometime after 3 A.M.[sic].

On December 10th, Anderson wrote the following about Heib's alibi:

Both officers (Lehrkamp and Anderson) decided that we needed to find out for sure if Heib would remain a suspect. A photo lineup was decided to be the best way.

[¶ 72.] Heib was arrested after two of the three juveniles identified him from the lineup. None of Heib's alibi witnesses were interviewed again until December 15th. One juvenile stated in her initial interview, that for a moment she remembered not being able to see the unnamed suspect. However, all of them stated that he accompanied them to Piedmont immediately after the alleged rapes.

[¶ 73.] The majority opinion notes that law enforcement should not have to investigate every claim of innocence. However, probable cause is concerned with probabilities. In the present case, Lehrkamp went out of his way to conjure every *possible* way Heib could be guilty, no matter how remote or irrational and even continued to cover and rationalize his actions after he arrested Heib. Lehrkamp only presented to the grand jury those facts and inferences that supported his spin on the events and failed to present the facts and inferences that detracted therefrom in Heib's favor. In fact, Lehrkamp continues to maintain that nothing went wrong with his investigation and that Heib should have been prosecuted.

[¶ 74.] **4. Inconsistent & Conflicting Stories Bolster Credibility.**

[¶ 75.] There are three major problems with the majority opinion's bewildering statement that conflicting accounts of the same event bolstered the juvenile's credibility.[13]

[¶ 76.] First, this statement is an inference that is made in favor of Lehrkamp, the moving party. It was therefore inappropriate and contrary to law.

[¶ 77.] Second, even assuming this inference to be true, it ignores the fact that the second girl changed her story over-night. If identical stories "lead one to conclude" they are "rehearsed," Lehrkamp should have reached that conclusion on the morning of December 11th. Indeed, the second girl's story was initially inconsistent and then she had a "dream" that provided consistent descriptions of the unnamed suspect. She brought written notes to the interview that provided an identical description to what her co-accusers said the prior day. If her story on the 10th was inconsistent and credible, then her consistent story on the 11th should have been determined to be incredible.

[¶ 78.] Finally, the majority opinion's inference conflicts with Lehrkamp's own admission. In his deposition, Lehrkamp gave the following answer to a hypothetical by Heib's counsel:

> *Counsel:* If A says something different than B and those statements are inconsistent, what does that tell you?
> *Lehrkamp:* That there's a problem.

[¶ 79.] **5. Inconsistencies on Account of Age**

[¶ 80.] The majority opinion claims that it is reasonable for police officers to accept conflicting testimony from children. In support of its holding it cites *Rankin v. Evans,* 133 F.3d 1425, 1442 (11th Cir. 1998). *Rankin* is factually inapposite. In *Rankin,* the victim was a three-year-old girl. The present case involves three middle school students. Certainly we can expect middle school students to tell more consistent stories than three year olds. Moreover, the inconsistency in *Rankin* dealt only with the time of the alleged assault. *Id.* at 1443 fn. 22. The present case involved inconsistencies as to both the identity of the perpetrator, and how the assaults occurred. Finally, the court in *Rankin* held it was reasonable for the

---

**13.** It should be noted that the majority opinion seems to have a problem with consistency as well. At one point it says that the inconsistencies made the children more believable. However, later they state that they "agree the changes caused the children's credibility to diminish."

police officer to overlook the inconsistency because he had "formal training" and "extensive practical experience in child abuse cases." *Id.* There is nothing in the record that demonstrates that Lehrkamp has similar qualifications.[14]

[¶ 81.] **6. Medical Evidence**

[¶ 82.] The majority opinion spends a considerable amount of time explaining the results of the rape examinations. Specifically, one doctor noted that sexual contact was probable; the other doctor believed it was "fairly likely." This was fairly strong evidence that a crime had been committed with these juveniles. However, it failed to provide probable cause that it was *Heib who committed the crime.* (emphasis added). No semen, hair samples, or fabric samples gathered as a result of these tests pointed to Heib.[15] In fact, it was later determined that the juveniles were lying to cover up their activities while skipping school.

### Conclusion

[¶ 83.] After viewing the evidence in the light most favorable to Heib, a reasonable jury could find that Lehrkamp did not have probable cause for arrest. Each inconsistent fact or statement creates a genuine issue of material fact. We should reverse the grant of summary judgment and remand for a jury trial.

[¶ 84.] MEIERHENRY, Justice, joins this dissent.

---

**14.** It should also be noted that *Rankin* is procedurally inapposite to this case. *Rankin* was an appeal from a judgment not withstanding the verdict rendered in favor of the defendant. The district court in *Rankin* had the opportunity to sit through an entire trial and listen to the credibility of the witnesses. Because the present case is an appeal from summary judgment, the circuit court did not have a similar opportunity.

**15.** The majority opinion also points to the girls' consistent description of Wisser. While this may have provided probable cause to arrest Wisser, it does little to justify the arrest of Heib.