560 P.2d 1249

Mike WALSH and "Jane" Walsh, husband and wife, and City of Tucson, a Municipal Corporation, Appellants,

v.

Pamela K. EBERLEIN, an unmarried woman, Appellee.

No. 2 CA–CIV 2195.

Court of Appeals of Arizona, Division 2.

Dec. 22, 1976.

Rehearing Denied Jan. 31, 1977.

Review Denied Feb. 23, 1977.

Lesher, Kimble, Rucker & Lindamood by Michael J. Gothreau, Tucson, for appellants.

Messing, Franklin & Feulner, P.C., by George J. Feulner, Jr., Tucson, for appellee.

## OPINION

RICHMOND, Judge.

On the night of August 28, 1972, there were burglaries at several Mary Moppet's day care centers in Tucson, Arizona. Both cash and blank checks were taken, and from one center located at 5540 East Hampton a purse belonging to a customer, Sharon Del Pino, also was removed. The purse contained, among other items, Miss Del Pino's driver's license.

Detective Mike Walsh, assigned to the Tucson Police Department burglary detail, initiated an investigation the following day. Shortly thereafter, a number of forged checks drawn on a Mary Moppet's account began surfacing at various business locations throughout Tucson. During the next few months approximately 15 such checks were investigated by Walsh. Ultimately, the officer's inquiry became concentrated on the Mary Moppet's on East Hampton, as the checks cashed had been made payable to Sharon Del Pino. Walsh determined that the appellee had been employed at that location during the latter part of July, 1972. He obtained a driver's license photograph of Pamela Eberlein from the Department of Motor Vehicles and showed it, along with photographs of other young women, to Salvatore Rodriguez, who had cashed one of the checks in question. Rodriguez identified the picture of appellee, who was arrested shortly thereafter.

In three subsequent interviews, a "mug shot" of appellee obtained after her initial booking was shown to and identified by three additional witnesses during the course of photo line-ups. In each case statements resulting from the identifications were taken to the office of the County Attorney and complaints were issued. Appellee was arrested and/or charged with passing four forged checks.

During the following months, Ms. Eberlein unsuccessfully attempted to exonerate herself. Handwriting samples were submitted to an expert for the purpose of comparing them with writings on the checks. The results returned negative. A poloygraph examination indicated a possible lack of involvement. Officer Walsh was provided with the name, telephone number and address of an alibi witness, but never communicated with the witness.

In April of 1973, one Marialana Rososchi confessed to having passed forged checks using the same name and identification as that used in passing the checks with which appellee was charged. The signature on one of the Rososchi checks was almost identical to one of the endorsements on a check allegedly forged by appellee. Further, it appears that Rososchi had also used the name of her stepfather, Mari Souther, on certain checks that she admitted passing, which was the same name used on a check with which Eberlein was charged.

Officer Walsh informed the deputy county attorney, Thomas Letnes, of the handwriting results but remained silent as to the possible connection between the Eberlein and Rososchi cases. Letnes, however, learned of the latter suspect through his supervisor shortly after charges against Ms. Rososchi were filed, i. e., approximately May, 1973.

The trial was set for May 16, 1973, but was continued to July 24. On July 25, the charges against Pamela Eberlein were dismissed after Letnes investigated the Rososchi file more carefully and realized that at least two, and possibly four, witnesses could not provide him with a definite in-court identification. Appellee thereafter instituted an action for malicious prosecution against Walsh and the City of Tucson, his employer, which resulted in a jury verdict

in her favor in the sum of $50,000 compensatory damages and $10,000 punitive damages. This appeal followed.

Appellants have raised several questions for review, but we need not consider them all. We believe that appellants' contention that the trial court erred in determining as a matter of law that the defendants were without probable cause in instituting or continuing the criminal proceeding has merit and is determinative.

■ The essential elements of malicious prosecution are (1) a criminal prosecution, (2) that terminates in favor of plaintiff, (3) with defendants as prosecutors, (4) actuated by malice, (5) without probable cause, and (6) causing damages. Slade v. City of Phoenix, 112 Ariz. 298, 541 P.2d 550 (1975).

> "Probable cause is a reasonable ground of suspicion, supported by circumstances sufficient to warrant an ordinarily prudent man in believing the accused is guilty of the offense. The test generally applied is whether, upon the appearances presented to the defendant, a reasonably prudent man would have *instituted* or *continued* the proceeding." (Emphasis added) 112 Ariz. at 301, 541 P.2d at 553.

It is well settled that probable cause to institute a proceeding constitutes a complete and absolute defense to an action for malicious prosecution. *Slade v. City of Phoenix*, supra; *McClinton v. Rice*, 76 Ariz. 358, 265 P.2d 425 (1953). Whether a given state of facts constitutes probable cause is a question of law to be determined by the court. *Slade v. City of Phoenix*, supra. In reviewing questions of law, an appellate court is not bound by the findings of the trial court, but is free to draw its own conclusions from the evidence presented. *Tovrea Land and Cattle Company v. Linsenmeyer*, 100 Ariz. 107, 412 P.2d 47 (1966). We therefore look to the record in order to ascertain if probable cause existed at the time of the initial actions in question.

Walsh knew that Ms. Eberlein had been employed by Mary Moppet's day care center for a very brief period of time shortly before the burglaries. The identification used in passing the checks was that of Sharon Del Pino, a customer of the Hampton location where appellee had been employed. Before Walsh sought a complaint or any prosecution was commenced, an independent witness in each instance had identified appellee from a photo line-up as the individual who in fact had passed the bad check.

■ In the absence of further circumstances, an eye-witness identification of an individual furnishes probable cause to assume the guilt of the party identified. *Watzek v. Walker*, 14 Ariz.App. 545, 485 P.2d 3 (1971). Appellee has suggested that Officer Walsh might have performed a more thorough investigation before seeking the complaint. This may well be true, but as our highest court stated in *Slade*:

> "Aided by hindsight, it is suggested that the police officer should have conducted an independent investigation of the complaint since there was no urgency in filing a criminal case. Additional investigation might have avoided the mistake in this case, but this position confuses the ideal with the minimum. Police depend upon the information furnished by citizens, and, unless the contrary appears, they should be able to depend upon the presumption that men speak the truth." 112 Ariz. 301, 541 P.2d 553.

The decision in *Watzek v. Walker*, supra, is readily distinguishable. There, the only evidence upon which a police officer based his complaint was the photographic identification of a Negro female by a Caucasian male. The photograph of an additional prime suspect, known to the officer at the time, was not even inserted in the sample shown to the potential witnesses. Further evidence was introduced to the effect that Caucasians are not able to identify Negroes as well as they can identify other Caucasians.[1] Unlike *Watzek*, this case lacks circumstances sufficient to cast doubt on the information elicited from the witnesses. Cf., *Slade v. City of Phoenix*, supra.

1. Ms. Eberlein is Caucasian.

■ An analysis of the foregoing leads us to conclude that the identifications, coupled with the appellee's employment history with Mary Moppet's, would provide a reasonably prudent man with probable cause to believe that appellee was guilty of the offense. It would have been a rare police officer who would have believed otherwise. The fact that knowledge of an additional suspect later came to light is irrelevant at this point.

■ In the alternative, however, appellee urges that even assuming there existed sufficient probable cause to institute the prosecution, there was a lack of probable cause for continuation once the facts surrounding Marialana Rososchi became known.

What is meant by "continuation" of a proceeding does not appear to have been answered in any depth in Arizona jurisprudence. Although the cases from other jurisdictions and law treatises dealing with the problem are not in complete harmony, one general principle has emerged. Where the instigator of a proceeding loses control over the case once the prosecution has been initiated, his participation in the prosecution thereafter is not such as will subject him to liability. 52 Am.Jur.2d Malicious Prosecution § 26 (1970); see also, Western Oil Refining Co. v. Glendenning, 90 Ind.App. 631, 156 N.E. 182 (1927). Thus a malicious prosecution action will not lie where a prosecuting attorney is left to judge the propriety of proceeding with the charge and acts on his own initiative in doing so. See, 54 C.J.S. Malicious Prosecution § 17 (1948).

In the case at bar, appellee asserts that by April, 1973, the appellants had the handwriting and polygraph results, as well as information pertaining to Rososchi. This, it is claimed, dissipated any probable cause which might have previously existed. A close inspection of the record reveals, however, that this information also was known to Letnes, the deputy county attorney, at approximately the same time. Walsh had informed the prosecutor of the handwriting results, and the polygraph test results also had been conveyed to him. It was the prosecutor who decided against a further polygraph test, and who elected to oppose the request for a live line-up to impeach the previous photographic identification.

Letnes's supervisor, who had approved the complaint against Rososchi, told Letnes of that development shortly after charges against Rososchi were filed and discussed the case with him.[2] The deputy county attorney still believed that there was sufficient evidence of Eberlein's guilt to go to the jury. He testified:

"I felt I knew I had enough evidence to get the case to a jury. In other words, the judge would not throw us out of court. It was one of the type of cases that I didn't know what the jury would do with it. There was sufficient evidence to convict. There was a possibility of acquittal, also. It was a case that was presentable to the court, but not a definite winner, as far as the case was concerned."

Letnes had received information that Rososchi had been given the stolen identification at a party in November, which was after the period in which Ms. Eberlein was charged. Further, he testified that the photograph of Rososchi did not bear a physical resemblance to the description of the individual passing the forged checks. In short, Letnes had virtually the same information as Officer Walsh, and, after his own investigation of the Rososchi file directed the prosecution of Eberlein until July 25, 1973. According to Letnes, the proceedings were clearly out of Walsh's hands.

"Q. And before you dismissed the charges, you talked to Mike Walsh

2. Apparently appellee believes that the failure of Walsh to personally inform Letnes of the Rososchi case rendered him liable for malicious continuation of the prosecution. Even assuming arguendo that Walsh had a duty to disclose the facts, we cannot say that his silence was a proximate and efficient cause of the continuation of the initial action, as the facts which would have been submitted were already known by the prosecutor. Cf., Siegal v. O. M. Scott & Sons, Co., 73 Ohio App. 347, 56 N.E.2d 345 (1943).

about this, right? And asked him if it would be all right with him since he was the one that initiated the whole business in the first place?

"A. It's not Mike Walsh's decision at that point."

It is our opinion that the trial court erred in its probable cause determination. By this decision we do not in any way attempt to condone the abusive and intimidating police tactics described by appellee, yet at the same time we cannot find that these actions constituted the tort of malicious prosecution.

Reversed, with directions to enter judgment in favor of defendants.

HOWARD, C. J., and HATHAWAY, J., concur.