# IN THE SUPREME COURT OF IOWA

No. 22–0581

Submitted February 21, 2023—Filed May 19, 2023

**JOSHUA VENCKUS,**

Appellant,

vs.

**CITY OF IOWA CITY** and **ANDREW RICH,**

Appellees.

_____

Appeal from the Iowa District Court for Johnson County, Chad A. Kepros, Judge.

An individual who filed a civil action against county prosecutors and a city police detective following his acquittal on a sexual assault charge appeals the summary judgment granted to the city and the police detective on his remaining common law and constitutional tort claims. **AFFIRMED.**

Mansfield, J., delivered the opinion of the court, in which all justices joined.

Martin Diaz (argued) of Martin Diaz Law Firm, Swisher, and M. Victoria Cole of M. Victoria Cole Law Firm, P.C., Cedar Rapids, for appellant.

Elizabeth J. Craig (argued) and Jennifer L. Schwickerath, Assistant City Attorneys, Iowa City, for appellees.

**MANSFIELD, Justice.**

### I. Introduction.

Claiming that he was ill-served by Iowa's justice system, an individual who was acquitted of a sexual assault charge brought suit against county prosecutors and city police for allegedly pursuing a groundless case as to which he had an airtight alibi—even though his DNA was found on the victim. In 2019, we reviewed whether the allegations stated a claim for relief. *See generally Venckus v. City of Iowa City* (*Venckus I*), 930 N.W.2d 792 (Iowa 2019). We held that the county prosecutors, with the exception of one claim related to the filing of an ethics complaint, were entitled to dismissal from the case based on judicial process immunity. *Id.* at 805. However, we generally rejected the investigating detective's arguments for dismissal on the pleadings, concluding that the claims were not well-enough developed to determine whether judicial process immunity or the statute of limitations applied. *Id.* at 806.

Following remand and dismissal of the remaining claim against the county prosecutors, the focus of the case became the role of the detective. The plaintiff maintains that the detective engineered the prosecution against him despite being convinced that the plaintiff was actually in Chicago during the weekend in question.

After discovery and lengthy summary judgment submissions, the district court granted summary judgment to the detective and his employer, the city. The plaintiff appeals. We conclude that summary judgment was properly granted. The plaintiff's continuing malicious prosecution claim cannot succeed because

the sexual assault charge was supported by probable cause throughout the criminal proceeding, the prosecutors had the same facts and evidence as the detective had, and the prosecutors made the decision to continue the prosecution. The plaintiff's constitutional tort claims cannot go forward for the reasons set forth in *Burnett v. Smith*, ___ N.W.2d ___, ___, 2023 WL 3261944, at *3–16 (Iowa May 5, 2023), decided earlier this term. Therefore, we affirm the district court judgment.

## II. Background Facts and Proceedings.

**A. The Sexual Assault, Investigation, and Criminal Trial.** Early on the morning of Saturday, February 16, 2013, at around 4:30 a.m., L.M. was brutally raped and assaulted at a house in Iowa City. The house had been rented by several individuals, including Joshua Venckus. That night a party had taken place at the house; L.M. had been invited and became intoxicated. She fell asleep on a couch in the main living room, only to be awakened by the horrible sensation of someone pinning her down and cutting off her breathing. When later interviewed, she remembered two distinct attacks, about ten seconds apart from each other.

L.M. ran out of the house screaming for help. Nearby, John Munn had been working on his son's car to get it thawed out and running. Munn heard L.M.'s cries for help and went to her. Munn also saw a man leave via the same door that L.M. had exited and then go back in that door. L.M. grabbed Munn and said, "[P]lease help me. They raped me."

Munn started walking L.M. in the direction of the Iowa City Police Department. En route, they ran into an officer who had been dispatched on an unrelated call. More officers were summoned. L.M. was badly bruised and bleeding, and she had been bitten on her back. At the scene, L.M. told a police officer that there had been an attacker, followed by a pause of about two minutes, and then the attacker had jumped on her again, going for her throat. L.M. fought back, kicking and hitting until her attacker got up and ran out the door.

An ambulance took L.M. to the hospital, where she was examined and treated for her injuries. L.M. told the sexual assault nurse examiner at the hospital that she had been assaulted by one or two unknown male assailants. Examiners took swabs from her fingernails, her cervix, her back where she had been bitten, and other areas of her body and clothing.

Andrew Rich of the Iowa City Police Department was the detective on call and became the lead investigator on the case. He arrived at the house and met there with other police. Together they found Venckus's roommates asleep in their rooms. Their bedrooms were adjacent to the room where the attack had occurred. When they went in, the officers shouted that police were entering the building. The roommates did not wake up immediately. Upstairs, a door was locked, so officers had to break in to enter. It wasn't until the residents were physically shaken by officers that they finally got up. When interviewed, the roommates explained that they didn't know what had happened. They also said that Venckus—their friend and roommate—had been in Chicago that weekend. One

of the roommates initially said "Josh" had been at the party, but later took back that statement.

The residence also contained a basement apartment that could be entered only through a separate outdoor entrance. Venckus and another man used that apartment. The other man was found asleep when police entered. Police discovered that a window to that basement apartment had been opened and found a handprint on the window, a boot print on a chair inside the window, and a wallet just outside in the window well. The wallet belonged to Ryan Markley. When investigators searched Markley's residence, they found that his boot matched the print they had found. They also recovered a marijuana pipe in Markley's apartment that had been taken from the basement apartment.

Initially, the police focused their investigation solely on Markley. However, DNA testing on the samples taken from L.M.'s body and clothing returned two different male DNA profiles as contributors: Markley's and an unknown second person's. This unknown male's DNA was found in skin cells in L.M.'s underwear, as a contributor to DNA from the fingernail swabs, and as a contributor to the bite mark. Additionally, a sperm from this unknown male was microscopically identified in L.M.'s underwear, and a sperm fraction was found on her dress. Sperm from this individual was later found on the victim's cervix. Investigators tested DNA from all males known to have attended the party, but couldn't find a match.

Detective Rich turned his attention to getting a sample from Venckus. By now, it was late August 2013. Detective Rich went to the house again and was

told by one of the roommates that Venckus was no longer living there and that they did not know where he was living. On October 21, Detective Rich was able to reach Venckus on the phone. Venckus said that he had been out of town when the sexual assault took place but that he would come in and talk to Detective Rich. For about three weeks after that, Detective Rich was unable to reach Venckus. Then, on November 12, Detective Rich spoke with Venckus again. He came in for an interview later that day. Venckus told Detective Rich he had been in Chicago with his parents when the assault happened and consented to providing a DNA sample. In early January 2014, testing confirmed that he was the second unknown male contributor.

Detective Rich and another detective arranged for Venckus to come into the police department for further questioning on January 24, 2014—almost one year after the assault. Venckus stood by his story and told investigators that he had been in Chicago that weekend visiting family. He said that he saw a movie with them on Friday night at around 9 p.m. Venckus told investigators that he wasn't sure how he got to Chicago that weekend—either he took a bus or got a ride from a friend. As he explained, he didn't have a car. Venckus offered his bank card and cell phone to the detectives as ways to verify that he was not in Iowa City that weekend.

Venckus had purchased a new phone on February 17, 2013, the day after the attack. He said that he used cheap, prepaid cell phones but kept the same SIM card so his phone number didn't change. Bank card records later showed

that a food purchase and a movie ticket purchase had been made in the Chicago area on February 15, 2013.

At the end of the interview, Venckus was arrested based on a warrant that Detective Rich had obtained that same day. Venckus was jailed following the arrest, but six days later he was released on bond. At the January 30, 2014 bond modification hearing, a sheriff's deputy overheard Venckus's mother tell someone on her cell phone that "they made me say he was in Chicago."

Venckus was charged by trial information on February 5, 2014, with second-degree sexual abuse, a class "B" felony. *See* Iowa Code § 709.3 (2013). Venckus pleaded not guilty and asserted an alibi defense.

Anne Lahey, Assistant Johnson County Attorney, was the lead prosecutor assigned to Venckus's case. She was an experienced prosecutor who had tried many sexual assault cases. Two other prosecutors—Dana Christiansen and Naeda Elliot—assisted Lahey on the case.

Detective Rich followed up on Venckus's alibi. Venckus's claim of having been in Chicago for the weekend was supported by his roommates and family. In addition, a Chicago-area attorney later testified in deposition that he had met with Venckus in his law office at about 2 p.m. on Friday afternoon, February 15, 2013. However, Detective Rich couldn't find any records of Venckus having taken a bus to Chicago. He also interviewed the friend who would have driven Venckus had he not taken the bus. The friend told police he had driven Venckus that weekend, but he failed a polygraph test.

Venckus's counsel provided a web-based file-sharing service to Detective Rich and to prosecutors. Venckus's counsel uploaded information they viewed as exculpatory that they might use as exhibits onto this shared drive. Every time Venckus's counsel would upload a document, Detective Rich and the prosecutors received notice and access to the document.

In addition to his alibi, Venckus's defense centered on the theory of transferred DNA. That is, Venckus's expert opined that DNA from Venckus's blanket—which had been used to cover L.M. when she went to sleep in the living room—had transferred from Markley's wet penis or finger to L.M. during the attack. Venckus's blanket had been "replete" with his DNA, and Venckus claimed he would use it to clean up after sex or masturbation. Meanwhile, Venckus's expert witness noted that the quantity of Venckus's sperm found on L.M. was not consistent with ejaculation. She additionally emphasized that L.M.'s blood had been found on the inside of Markley's jeans, her skin cells had been found in the fly of his jeans, and Markley's skin cells had been found in her cervix. Lahey, however, recalled being told by her experts that it was "almost impossible" for transferred DNA to have ended up on a cervical swab, as it had in this case. Detective Rich recalled the same.

Venckus and Markley were set for a joint trial. Detective Rich was deposed for a second time on April 1, 2016. At that time, Detective Rich made admissions that there was no evidence that more than one person committed a sex act with L.M. He also testified that based on the evidence, it leaned more heavily toward Venckus being the person who had committed the sex act. Detective Rich also

admitted that he had not found any connection between Markley and Venckus. On April 15, the district court granted Markley's motion for severance. This meant that Markley's trial was set to proceed as scheduled on May 17; a new date was ordered for Venckus's trial.

Markley's counsel had been pressing the Johnson County Attorney's Office to enter into a plea agreement with their client. On May 4, a plea deal was reached in which Markley entered a guilty plea to second-degree burglary, a class "C" felony, and an *Alford* guilty plea to assault with intent to commit sexual abuse without injury, an aggravated misdemeanor. *See* Iowa Code § 708.1; *id.* §§ 709.1, .11; *id.* §§ 713.1, .5(1)(b), (2). Sentencing was held open, and Markley agreed to make himself available to Detective Rich for a proffer interview and to testify at Venckus's trial if requested. Detective Rich was present at the meeting where the plea agreement was discussed and supported it. Lahey was opposed to the agreement but was overruled by her superiors. She ended up signing the agreement.

Venckus went to trial beginning September 6. Lahey did not believe Markley was credible and did not call him as a witness. After the State rested its case-in-chief, Venckus moved for a judgment of acquittal; the motion was denied. He moved again at the conclusion of evidence; this motion was also denied. The case was submitted to the jury at the end of the day on September 20. At 3:30 p.m. the next day, the jury returned a verdict of not guilty. Venckus's record was expunged the following day.

**B. Civil Proceedings.** After his acquittal, Venckus filed a petition asserting claims against Detective Rich and the City of Iowa City, collectively the "city defendants," for defamation, abuse of process, and malicious prosecution. He asserted claims against Lahey, Elliott, Christiansen, and Johnson County, collectively the "county defendants," for abuse of process. Against all defendants, Venckus alleged claims arising directly under the Iowa Constitution. These included violations of the right to freedom of movement and association under article I, section 1; the right to liberty under article I, section 1; the right to due process, a fair trial, and equal protection under article I, sections 6 and 9; and the right against unreasonable seizure under article I, section 8.

The defendants filed a motion to dismiss for failure to state a claim, which the Johnson County District Court initially granted. Venckus then filed a motion for reconsideration, and on reconsideration, the district court denied the motion to dismiss in its entirety.

The defendants sought interlocutory appeal. We granted the application and retained the appeal. We issued an opinion where we affirmed in part, reversed in part, and remanded. *Venckus I*, 930 N.W.2d at 810.

We found that the Iowa Municipal Tort Claims Act (IMTCA) applied to Venckus's claims. *Id.* at 807–09. On the merits, we determined that—with one exception—all claims against the county defendants related to their prosecutorial roles and therefore were barred by judicial process immunity. *Id.* at 805. The exception was a claim that the county defendants had filed an ethics

complaint against Venckus's defense attorney solely to bully and distract her. *Id.* As to that claim, we held that dismissal had been properly denied. *Id.*

With respect to the city defendants, we ordered dismissal of the defamation claim on the ground it was time-barred. *Id.* at 807–09; *see* Iowa Code § 670.5 (2018). However, we affirmed the district court's refusal to dismiss the malicious-prosecution and abuse-of-process claims because the record was not well-enough developed to determine whether they might be time-barred or covered by judicial process immunity. *Venckus I,* 930 N.W.2d at 809–10.

On remand, the case continued. The district court ordered Venckus to file a second amended petition to clarify the legal and factual bases for his remaining claims. In Venckus's second amended petition, he limited his claims against the city defendants to "continuing" malicious prosecution and constitutional tort claims. Thereafter, the district court granted the county defendants' motion to dismiss the remaining claim against them arising out of their filing of an ethics complaint. The court determined that this claim was foreclosed by the disciplinary-process immunity set forth in Iowa Court Rule 34.12.

Subsequently, the city defendants filed a motion for summary judgment on the remaining claims. The district court granted the motion in full. Regarding the continuing malicious prosecution claim, the district court concluded that it was not recognized by Iowa law. Additionally, the court noted that even if it were recognized, the claim would be barred on other grounds:

> [T]he Johnson County Attorney's Office staff . . . continued the prosecution of Plaintiff after the criminal charges had been filed, not Defendant Rich. Plaintiff has offered no specific evidentiary fact to show that Defendants' basis for probable cause should have

changed throughout the course of the investigation and prosecution, particularly where the DNA evidence that initially brought Plaintiff into light as a suspect did not change throughout the proceedings and even was found to have been inside the victim. The State's trial information naming Plaintiff was approved by the Johnson County District Court. . . . [A]t no point in the criminal proceedings did any order from the Court or any evidence in general exclude the likelihood of Plaintiff's DNA being found on the victim. Even if he had reason to do so, Defendant Rich did not have the ability to tell the prosecution to stop their case against Plaintiff, once it had been initiated and as it continued. Then-Assistant Johnson County Attorney Anne Lahey's testimony has been that she continued to believe throughout the course of the case that Plaintiff was guilty.

The district went on to hold that Venckus's constitutional claims were invalid for several independent reasons. To begin, the court concluded that direct constitutional claims under *Godfrey v. State*, 898 N.W.2d 844 (Iowa 2017), were not available against municipalities or municipal employees. The court also found that article I, section 1 of the Iowa Constitution was not self-executing, and that as for the remaining claims, the city defendants were absolutely immune from suit because their conduct fell within the judicial process immunity. Additionally, the court determined that the claims would also be barred by discretionary function immunity, the "all due care" immunity articulated in *Baldwin v. City of Estherville*, 915 N.W.2d 259, 279–81 (Iowa 2018), and qualified immunity. Accordingly, the district court granted summary judgment in favor of the city defendants on all remaining claims.

Venckus appealed, and we again retained the appeal.

**III. Standard of Review.**

"A motion for summary judgment is appropriately granted when 'there is no genuine issue as to any material fact and that the moving party is entitled to

a judgment as a matter of law.'" *Godfrey*, 898 N.W.2d at 847 (quoting Iowa R. Civ. P. 1.981(3)). "On motion for summary judgment, the court must: (1) view the facts in the light most favorable to the nonmoving party, and (2) consider on behalf of the nonmoving party every legitimate inference reasonably deduced from the record." *Garrison v. New Fashion Pork LLP*, 977 N.W.2d 67, 76 (Iowa 2022) (quoting *Morris v. Legends Fieldhouse Bar & Grill, LLC*, 958 N.W.2d 817, 821 (Iowa 2021)). We review a district court ruling on summary judgment for correction of errors at law. *Quality Plus Feeds, Inc. v. Compeer Fin., FLCA*, 984 N.W.2d 437, 444 (Iowa 2023).

**IV. Analysis.**

**A. Malicious Prosecution Claim.** We begin by addressing Venckus's continuing malicious prosecution claim. Malicious prosecution is a common law tort, and Venckus is asserting it against the City and Detective Rich—i.e., a municipality and its employee acting within the scope of his employment. *See* Iowa Code §§ 670.1, .2. Accordingly, this claim is governed by the IMTCA. *Id.* § 670.2; *Venckus I*, 930 N.W.2d at 807–09. The IMTCA, unlike the Iowa Tort Claims Act (ITCA), permits malicious prosecution claims. *Compare* Iowa Code § 669.14(4), *with id.* § 670.4.

"A malicious prosecution is one that is begun in malice, without probable cause to believe it can succeed, and which finally ends in failure." *Liberty Loan Corp. of Des Moines v. Williams*, 201 N.W.2d 462, 465–66 (Iowa 1972) (quoting *Burt v. Smith*, 73 N.E. 495, 496 (N.Y. 1905)). The elements of a malicious prosecution claim are: "(1) a previous prosecution, (2) instigation of that

prosecution by the defendant, (3) termination of that prosecution by acquittal or discharge of the plaintiff, (4) want of probable cause, (5) malice on the part of [the] defendant for bringing the prosecution, and (6) damage to [the] plaintiff." *Linn v. Montgomery*, 903 N.W.2d 337, 345 (Iowa 2017) (alterations in original) (quoting *Wilson v. Hayes*, 464 N.W.2d 250, 259 (Iowa 1990) (en banc)).

In the context of civil suits for malicious prosecution, we have adopted the probable cause standard from the Restatement (Second) of Torts. *See Sisler v. City of Centerville*, 372 N.W.2d 248, 251 (Iowa 1985). That standard provides,

> One who initiates or continues criminal proceedings against another has probable cause for doing so if he correctly or reasonably believes
>
> (a) that the person whom he accuses has acted or failed to act in a particular manner, and
>
> (b) that those acts or omissions constitute the offense that he charges against the accused, and
>
> (c) that he is sufficiently informed as to the law and the facts to justify him in initiating or continuing the prosecution.

Restatement (Second) of Torts § 662, at 423 (Am. L. Inst. 1977). Under this standard, Detective Rich had probable cause sufficient to defeat a malicious prosecution claim if he reasonably believed that Venckus had committed sexual assault. *See id.*; *Sisler*, 372 N.W.2d at 251. "[It] is well settled that the discharge of a defendant in a criminal prosecution does not raise even a presumption of want of probable cause." *Gordon v. Noel*, 356 N.W.2d 559, 562 (Iowa 1984) (alteration in original) (quoting *Philpot v. Lucas*, 70 N.W. 625, 626 (Iowa 1897)).

In asking us to affirm the district court's grant of summary judgment, the defendants first argue that Venckus is relying on a tort of "continuing" malicious

prosecution that does not exist under Iowa law. Venckus responds that limiting malicious prosecution to the point of arrest would make that claim redundant to false arrest. In his view, if probable cause dissipates at some point, yet the prosecution continues, individuals responsible for continuing the criminal proceedings may be held liable for malicious prosecution. In that connection, Venckus urges us to adopt the Restatement (Second) of Torts section 655, entitled, "Continuing Criminal Proceedings." That provision says, "A private person who takes an active part in continuing or procuring the continuation of criminal proceedings initiated by himself or by another is subject to the same liability for malicious prosecution as if he had then initiated the proceedings." Restatement (Second) of Torts § 655, at 413.

Other jurisdictions and legal encyclopedias have acknowledged the viability of continuing malicious prosecution claims. *See Zamos v. Stroud*, 87 P.3d 802, 810 (Cal. 2004) ("[A]n attorney may be held liable for malicious prosecution for continuing to prosecute a lawsuit discovered to lack probable cause."); *Arquette v. State*, 290 P.3d 493, 500 (Haw. 2012) ("We hold that continuing to prosecute an action without probable cause is included in the tort of malicious prosecution."); *Beaman v. Freesmeyer*, 131 N.E.3d 488, 499 (Ill. 2019) ("[A] person can be liable for commencing *or continuing* a malicious prosecution even if that person does not ultimately wield prosecutorial power or actively deceive prosecutors." (emphasis added)); 52 Am. Jur. 2d *Malicious Prosecution* § 24, at 214 (2021) ("Even if there was probable cause for the commencement of an action, if the person afterwards acquires the means of

asserting the charge was not well founded, the failure to intervene and have the prosecution discontinued or to sever his or her connection with it subjects that person to malicious prosecution liability."); 54 C.J.S. *Malicious Prosecution* § 13, at 815 (2020) ("A cause of action for malicious prosecution is not limited to the situation where the present defendant initiated the prior proceeding, and one who plays an active role in continuing an unfounded criminal proceeding when otherwise it would have been terminated may be liable for malicious prosecution." (footnotes omitted)). Furthermore, the reporter's note to section 655 cites a nineteenth-century case from our court—*Johnson v. Miller*, 17 N.W. 34 (Iowa 1883)—"in support of the rule stated." Restatement (Second) of Torts Appendix § 655, reporter's note, at 355 (Am. L. Inst. 1981).

Notably, section 655 refers to "[a] private person," although it has been applied frequently to police and other public officials. Restatement (Second) of Torts § 655, at 413; *see Beaman*, 131 N.E.3d at 490 (involving police officer defendants); *see also Pierce v. Gilchrist*, 359 F.3d 1279, 1292 (10th Cir. 2004) (applying section 655 to a claim against a police department forensic chemist for "provid[ing] several false oral and written reports and withh[olding] exculpatory evidence from [the police department] and the District Attorney's office"); *Starks v. City of Waukegan*, 123 F. Supp. 3d 1036, 1061 (N.D. Ill. 2015) ("[E]ven if Waukegan Defendants had probable cause to *arrest* Starks, they still can be liable for malicious prosecution if they 't[ook] an active part in the[] prosecution *after* learning that there [wa]s no probable cause for believing the accused

guilty.' ") (first alteration added) (quoting Restatement (Second) of Torts § 655, cmt. *c*, at 414).[1]

Even assuming that we would recognize a tort of continuing malicious prosecution against a police officer—which we do not decide today—Venckus's claim still falls short for at least two reasons. First, at all times from his arrest until his acquittal, there remained probable cause to pursue the charge against Venckus. The ongoing existence of probable cause is fatal to Venckus's continuing prosecution claim. *See Limone v. United States*, 579 F.3d 79, 91 (1st Cir. 2009) (explaining that continuing malicious prosecution requires "an insistence that the prosecution go forward even after it has become clear that probable cause is lacking"); *Mitchell v. City of Boston*, 130 F. Supp. 2d 201, 216 (D. Mass. 2001) ("[E]ven if [the defendant police officer's] attempts to revivify a faltering prosecution constitute malicious prosecution, the existence of probable cause dooms this claim."); *Rodriguez v. City of Moses Lake*, 243 P.3d 552, 555 (Wash. Ct. App. 2010) (finding that malicious prosecution claims against a city and city fire marshal were properly dismissed where "probable cause continued until the conflicting evidence was weighed at trial and resolved in favor of [the plaintiff]").

---

[1]The Restatement confines the tort of malicious prosecution to "private persons" for the following reasons:

> The rule stated in this Section is applicable only to private persons who initiate or procure the institution of criminal proceedings. It has no application to public officials charged with the enforcement of criminal law in the performance of their public duty. These officials are protected from civil liability by an absolute privilege that is incident to their official position. The absolute privilege of a public prosecutor is stated in § 656.

Restatement (Second) of Torts § 653 cmt. *e*, at 408.

Most importantly, DNA evidence linked Venckus directly to the crime; indeed, his DNA was found in the victim's cervix. Venckus contends that the quality and quantity of his DNA evidence—particularly the absence of skin cells and seminal fluid—indicate that DNA transfer from his blanket was the only possible explanation for the presence of his DNA on L.M. Certainly, there was more physical evidence connecting Markley to the rape than Venckus. However, Lahey testified that although the DCI lab couldn't totally rule out the defendant's transfer theory, it would be almost impossible for sperm to show up on a cervical swab through a chain of transfer from Venckus to Venckus's blanket to Markley to L.M. In sum, Venckus's DNA transfer theory does not defeat probable cause.

Also, other than an attorney whose visit with Venckus occurred more than twelve hours before the sexual assault, the individuals supporting Venckus's Chicago-area alibi defense were exclusively friends and family. Venckus could not definitively say how he got to Chicago that weekend. No record of a bus ticket was found, and the friend who purportedly drove Venckus failed a polygraph test. Notably, Venckus replaced his cell phone the day after the attack.

Lahey believed that Venckus's roommates and family may have been trying to protect him. None of the roommates recalled hearing the attack despite their rooms being adjacent to the living room where it occurred. Munn described L.M.'s screams as being so loud that he mistook them for cats howling. Still, none of the roommates reported hearing anything. The morning following the assault, officers had to physically shake the roommates to wake them up, even after announcing "police" as they entered the house. When interviewed, one of

the roommates initially said that "Josh" had been at the apartment. At the bond modification hearing, a sheriff's deputy overhead Venckus's mother tell someone on her cell phone that "they made me say he was in Chicago."

None of this is to question the jury verdict exonerating Venckus. But a malicious prosecution claim—continuing or otherwise—requires a lack of probable cause. Probable cause existed here. A close reading of Venckus's briefing suggests that Venckus's real complaint has to do with Detective Rich's evolving and sometimes contradictory views about the case. Venckus points to a "change of opinion" that Rich underwent at trial, where Rich conceded for the first time that Venckus must have been in the Chicago area the weekend of February 15–17 but could offer no explanation for how Venckus got back to Iowa City in time to commit the crime.

Detective Rich's beliefs and opinions about the case may be relevant to the element of malice, but they do not demonstrate a lack of probable cause. Probable cause would depend on the evidence itself, not what one police officer *thought* about it.

We have said that for probable cause, "[t]he police need not have firm evidence which might lead to a conviction, or even to an indictment, but merely sufficient information to cause a reasonable man to believe that [the] defendant was involved in [a crime]." *State v. Horton,* 625 N.W.2d 362, 365 (Iowa 2001) (en banc) (alterations in original) (quoting *State v. Freeman,* 297 N.W.2d 363, 366 (Iowa 1980)).

In further support of his continuing malicious prosecution claim, Venckus also criticizes Detective Rich over the plea deal with Markley. But the appropriate person to complain about that deal is L.M., not Venckus. The fighting issue here is not whether Markley received a favorable deal, but whether Venckus was prosecuted without probable cause. We agree with the district court that he was not.

There is a second reason why Venckus's continuing malicious prosecution claim fails: Detective Rich did not, as a factual matter, cause the prosecution to continue. Everything he knew, the prosecutors knew. All of the exculpatory information provided by Venckus's counsel on the file-sharing service went to both Rich *and* the prosecutors. Lahey testified that even if Rich had wanted to dismiss the case, he wouldn't have been able to, since that decision rested within the discretion of the prosecutors. And Lahey believed in the case. She thought there was evidence that negated Venckus's alibi, she believed that he had attended the party, she found the DNA evidence compelling, and she personally rejected an invitation to dismiss the charges against Venckus.

With respect to a traditional malicious prosecution claim, we require the plaintiff to show the defendant instigated the prosecution. *Sergeant v. Watson Bros. Transp. Co.,* 52 N.W.2d 86, 90–91 (Iowa 1952). "To instigate the prosecution means that the party against whom damages are sought was the proximate and efficient cause of maliciously putting the law in motion." *Id.* at 91.

> In order to charge a private person with responsibility for the initiation of proceedings by a public official, it must therefore appear that his desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining

factor in the official's decision to commence the prosecution, or that the information furnished by him upon which the official acted was known to be false.

Restatement (Second) of Torts § 653, cmt. *g*, at 409; *see also Linn*, 903 N.W.2d at 346 ("[T]he plaintiff must prove the official would not have brought charges in the absence of the false information the defendant knowingly supplied.").

Jurisdictions recognizing the continuing malicious prosecution tort impose similar causation standards, which Venckus is unable to meet here. *See Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 228 (S.D.N.Y. 2006) (stating that an investigator's testimony "that he had 'input' with prosecutors" was insufficient to indicate that he was "responsible for initiating or continuing plaintiff's prosecution" and pointing out that the investigator neither created false information nor withheld material evidence); *Walsh v. Eberlein*, 560 P.2d 1249, 1252–53 (Ariz. Ct. App. 1976) (finding police officer not liable for malicious prosecution where the prosecutor had access to the same information as the officer and was in control of the case); *Holt v. City of Chicago*, ___ N.E.3d ___, ___, 2022 WL 2354880, at *19 (Ill. App. Ct. June 30, 2022) (rejecting malicious prosecution claim where, among other things, the plaintiff "failed to prove that [the defendant detective] played a significant role in causing his prosecution or did anything that overcame prosecutorial independence" and noting that the prosecutor "believed that the evidence supported [the plaintiff's] prosecution to a conviction"); 8 Stuart M. Speiser et al., *The American Law of Torts* § 28:6, at 553–54 (2011) ("A defendant has not 'caused a prosecution' in the sense that renders him or her liable when the defendant acts only in subordination to the

prosecuting attorney and under the latter's directions nor when the defendant states the bare facts as to the plaintiff's conduct to the prosecuting attorney, leaving the attorney to judge the propriety of proceeding with the charge . . . .").

This is not a case where Detective Rich knowingly provided false information to the prosecutors or knowingly withheld material information. *Cf. Rasmussen Buick-GMC, Inc. v. Roach*, 314 N.W.2d 374, 377 (Iowa 1982) (holding that causation was established when "[t]he jury could have found there would have been no prosecution absent the false information furnished by [the defendant]"); *see also Mut. Med. Plans, Inc. v. County of Peoria*, 309 F. Supp. 2d 1067, 1081 (C.D. Ill. 2004) ("The [Plaintiffs] do not cite, nor is the Court aware of any case in which a malicious prosecution claim against the investigating officer has survived summary judgment when the record reflects that the investigator disclosed all the fruits of his investigation to the prosecutor."); *Johnson*, 17 N.W. at 38–39 (indicating that the defendants could be legally responsible for the prosecutor's declining to dismiss the proceeding where the prosecutor did so based on "information derived from the defendants, and the jury . . . found [specifically] they did not state to such officer all the facts within their knowledge"). Accordingly, we agree with the district court that Venckus's continuing malicious prosecution claim against Detective Rich also fails for lack of causation.

For these two reasons, we hold that the district court properly granted summary judgment to the city defendants on Venckus's continuing malicious

prosecution claim. We do not reach whether the claim might be barred on other grounds as well.

**B. Constitutional Tort Claims.** We now turn to Venckus's direct claims for damages under article I, section 1; article I, section 8; and article I, section 9 of the Iowa Constitution. For the reasons stated in *Burnett*, ___ N.W.2d at ___, 2023 WL 3261944, at *3–16, we conclude that such claims are not available. Accordingly, we affirm the district court's dismissal of these claims as well.[2]

**V. Conclusion.**

For the foregoing reasons, we affirm the district court's grant of summary judgment to the city defendants.

**AFFIRMED.**

---

[2]The city defendants in this case have also called for us to overrule *Godfrey*, 898 N.W.2d 844.